## DANIEL H. CASWELL
### v.
## ANNA M. CASWELL.

*Fraudulent Divorce—Bill of Review—Laches—Delay of Fourteen Years —Sec..19, Chap. 22, R. S.—Domicile of Wife—Removal of Causes—Additional Abstract—Costs.*

1.  Where the proof of fraud is clear and cogent, and convincing reasons are given for the delay, mere lapse of time does not bar a bill of review to impeach a former decree for fraud.

2.  A decree may be attacked for fraud in its procurement after the three years, limited in Sec. 19, Chap. 22, R. S., and after the five years allowed for suing out a writ of error, if sufficient reasons are given for the delay.

3.  A decree of divorce procured through fraud, by one who has since re-married and has had children by such subsequent marriage, may be set aside upon a bill of review filed after a delay of fourteen years, if clear and convincing reasons appear for the delay.

4.  A bill of review filed in the Circuit Court to annul a former decree, granting a divorce by that court for fraud, is not removable to the Circuit Court of the United States, although the defendant resides in another State.

5.  Where it is necessary for the appellee to file an additional abstract in this court and the decree is affirmed, the costs thereof will be taxed against the appellant.

[Opinion filed August 26, 1886.]

APPEAL from the Circuit Court of Piatt County; the Hon. C. B. SMITH, Judge, presiding.

Mr. CHARLES W. THOMAS, for appellant.

The defendant's plea, setting up Sec. 19, Chap. 22, R. S., as a bar to this suit, should have been sustained. Lawrence v. Lawrence, 73 Ill. 577; Lyon v. Robbins, 46 Ill. 276; Southern Bank v. Humphreys, 47 Ill. 227.

When the General Assembly has undertaken to prescribe a method of obtaining jurisdiction of the persons of non-residents, and has done so, and at the same time has provided the remedy which may be resorted to by any person thus brought

into the local jurisdiction and conceiving himself to be wronged by the action of the court, it has enacted a complete code upon the subject, and the remedy given is the only remedy for the wrong which may be done under the provisions to which it is coupled. The statutory remedy supplanted all others. As no wrong was possible without the statute, the remedy given by the same statute is necessarily exclusive. So it has become a legal maxim that where a new right is given and a specific remedy for its violation provided by statute, the statutory remedy must be pursued. Ward v. Severance, 7 Cal. 126; Roberts v. Landecker, 9 Cal. 262; Fuller v. Edings, 11 Rich. (S. C.) 239; Butler v. State, 6 Ind. 165; Victory v. Fitzpatrick, 8 Ind. 281; McCormack v. T. H. R. R. Co., 9 Ind. 283; Cole v. Muscatine, 14 Iowa, 296; Hazen v. Essex Co., 12 Cush. 475; Camden v. Allen, 26 N. J. L. 398; Brown v. White Deer, 27 Pa. St., 109; Babb v. Mackey, 10 Wis. 371.

Mr. Charles Hughes, for appellee.

A decree of divorce obtained by fraud is void, has no binding effect and may be impeached and set aside, even though a subsequent marriage by one of the parties may have been consummated, and children born by such marriage. Adams v. Adams, 51 N. H. 388; Edson v. Edson, 108 Mass. 590; Comstock v. Adams, 23 Kans. 513; Graves v. Graves, 36 Iowa, 310; Rush v. Rush, 46 Iowa, 648; State v. Whitcomb, 52 Iowa, 85; Borden v. Fitch, 15 Johns. 12; True v. True, 6 Minn. 458; Crouch v. Crouch, 30 Wis. 667; Johnson v. Coleman, 23 Wis. 452; Jackson v. Jackson, 1 Johns. 424; Lawrence v. Lawrence, 73 Ill. 577.

Lapse of time is no bar to bringing suit to impeach a decree, including divorce decrees, obtained by fraud, when cause is shown for delay, and that the party seeking to impeach such decree is not guilty of *laches;* but the proof must be clear that the party is entitled to the relief prayed for. Adams v. Adams, 51 N. H. 388; Johnson v. Coleman, 23 Wis. 452; Sloan v. Sloan, 102 Ill. 581; Oakley v. Hurlbut, 100 Ill. 204; Lequatte v. Drury, 101 Ill. 77; Furlong v. Riley, 103 Ill. 628;

Warden v. Cornell, 105 Ill. 169, 178; Collier v. Beers, 106 Ill. 150; Cleaver v. Green, 107 Ill. 67; Boyden v. Reed, 55 Ill. 458; Castner v. Walrod, 83 Ill. 171.

The Statutes of Limitation will not begin to run until the discovery of the fraud complained of, especially where the adverse party conceals the fraud. McIntosh v. Saunders, 68 Ill. 128; Inter. Bank v. Jenkins, 104 Ill. 143, 155; Henry Co. v. Drainage Co., 52 Ill. 299; Wear v. Skinner, 46 Md. 257; R. R. Co. v. Mayo, 67 Me. 470.

CONGER, J. This is a bill in the nature of a bill of review brought by appellee in the Piatt Circuit Court, December 22, 1883, to impeach and annul a decree of divorce obtained by appellant in said court at its September term, 1869, on the ground of fraud.

Appellant and appellee were married at Montevideo, Uraguay, August 15, 1862, where they continued to reside until 1863, when they removed to California, and remained there until April 10, 1865, at which date Caswell sent his wife to her father's home in Brooklyn, New York. Upon the same day he mailed a letter to her father, James M. Willis, which says, among other things:

"My wife and boy left me to-day for New York in pretty good health. I could not leave to go with them although should liked to have gone. The doctor says a sea voyage will do her good and she must have exercise when she reaches New York and not take much medicine as she has taken too much already. I can not write to explain many things to you now which I will when I see you, although I know that you have lived with her longer than I have, but I think I understand her case pretty well. I shall be very lonesome now for a while. Good-bye. From your son,

"D. H. CASWELL."

Appellant continued to correspond with his wife and in the summer of 1866 visited her in Brooklyn and during the fall following they both removed to Cairo, Illinois, where they lived together until March, 1867, when appellant again sent his wife to her father's home in Brooklyn, continuing a cor-

respondence with her and occasionally sending her money, until he again visited her in Brooklyn in October, 1867, their daughter Catharine having been born some weeks before on September 29, 1867. After remaining with his wife until November 14, 1867, appellant left Brooklyn with the avowed intention of returning to Illinois to work at his trade of mill-wright, which he did, and on the 17th of the same month writes to her from Decatur, Illinois, that he had arrived in safety, etc., and expresses a hope that the baby and herself are well, etc. From this date until November 15, 1868, he continues to correspond with her, writing to her about once a week such letters as would ordinarily pass between husband and wife, informing her as to his business prospects, where he had worked, inquiring as to the health of herself and child, acknowledging receipt of letters from her and occasionally sending her money.

On the 15th of November, 1868, appellant writes to his wife from Decatur telling her he is going to work the next morning in a mill near Taylorville and instructs her to write him there, sends her $5 and says he will send her more when he gets through with the job, and as soon as he knows what he will do, or where he shall go, he will let her know, etc., and concluded: "I hope this will find you and baby well, as it leaves me at present, * * * so good bye—with a kiss for baby, from your husband,

"D. H. Caswell."

Fifteen days thereafter, on the 1st day of December, 1868, appellant filed in the Piatt Circuit Court a bill for divorce against appellee; charging that on December 10, 1865, his wife without cause deserted him and had for more that two years past persisted in such desertion.

Having thus set in motion the legal machinery which he hoped would sever the marital relation existing between himself and appellee, appellant six days thereafter—to prevent his victim from being uneasy or suspicious at the long silence that was to follow, wrote her the following letter:

"Taylorville, Dec. 6, 1868.

"*Dear Wife:* I will try and write you to-day, as I have

found out what I think that I shall do this winter, and where I shall go, as I told you in my last, that I was waiting to see some men that I expected here and they have come and I have made arrangements with them to go to Mexico. They are going to build a mill there and as I talk Spanish and can do the work on the mill and understand quartz mills too, as it is to be a quartz mill, they offer me $150 per month and board, so I think that the best thing I can do is to go. No doubt but that you will think it is a good ways off, but what is the difference whether I am here or there, if I can do better there than here. I think it is the best thing to go, for a man can not do anything without money, that you know as well as I do, and if I live, I think I shall do well there with the wages and I can save something to come home with in the spring. We shall start in the morning at six o'clock. There is five of us, the two men that I am going with and two others besides myself, and the men's names that I go with is Williamsons, and we shall go from here across the country into Texas and from there to Mexico with teams, and we expect that it will take us six weeks or two months to get there this time of the year, and if I have a chance to write on the way I will do so and if I have not, you will have to wait till I get there.

"They say it is a wild country that we shall go through, and if so, I don't expect that I shall have any chance to send any letters back. We have teams enough, so I shall take all my things, tools along, as well.

"Now, you will not go to feeling bad about my going, for I have considered it all over many times before I made up my mind to go; so, as we leave early in the morning, you need not write till you hear from me again, for I have forgotten the name of the place where we are going to, so I can not tell it to you now, although it is a Spanish name. I will send you $5 by this, for it is all I can spare now, for I have not got much and Walter Lovejoy owes me $20, and I will write to him and tell him to send it to you; so if you want it before you get any more from me, send to him for it and tell him that I wrote to you to do so, and if he can not send it all at once, he can send you $5 at a time till he pays you what he

owes me ; for he has not paid me anything, nor sent me any money either ; so I think that you can get along with the $5 I send you and the $20 he owes me till you hear from me again, although you need not feel bad if you do not hear from me till I get there, for if it is as they say, I don't suppose I shall have any chance to send any letters back. So take good care of the baby and don't spoil her, and when I get back I shall want to see a fine child of her.

" So remember me to all, and I hope this will find you all well, as it leaves me. So good-bye. From, your husband,

"D. H. CASWELL.

" P. S.—Write to Jane and Walt, and I think they will send you that money when you want it. I will tell them to do so.

"DAN."

Appellant, however, instead of going to Mexico, in January following, before any decree had been rendered upon his bill for divorce or any evidence had been taken thereon, went to Dayton, Ohio, and there married. His own explanation of this proceeding is as follows. "I was married to my present wife in January, 1869. It happened in this way: I was called away from here, on business, to Cincinnati. I had no intention of marrying when I left. I told Bixby I was going away, and would, perhaps, be gone some little time, and I supposed that this decree would be granted, as I understood from McWilliams, and to see him and get the papers. I got a letter from Bixby, saying he had seen the lawyer and got the papers all right, to hurry back, or something like that. I went from Cincinnati to Dayton, and met the lady I married, and we talked the matter over and concluded to get married to save a little expense. I had no money to waste. We got married and came to Illinois, and found the divorce had not been granted. I was misled by Bixby's statement. He told me afterward he referred to some patent papers. I said nothing to anybody until the divorce was secured, and then we went to Indiana, at Fort Wayne, and were re-married by a Justice of the Peace."

On the 18th of February, 1869, appellant and his friend Bixby appeared before the master in chancery of Piatt

County, and gave their testimony to be used in the divorce suit of appellant, as follows, as shown by the master's report:

"The testimony of Daniel H. Caswell, who swears that he was married to Anna M. Caswell, at Montevideo, on the 15th day of August, 1862, and that they lived together as man and wife until December 10, 1865, when she left him without any cause or provocation, and has continued to remain away, separate and apart from him ever since. She left him against his will. He lived in Piatt County when the bill was filed, and had been a resident of Illinois between three and four years prior to the filing of the same. Always provided his wife with such comforts as he was able to provide. It was about two years since he had heard from her, and he did not then know where she was.

"Also the testimony of Bixby, who swears that he was present at the marriage. That the parties lived together until December, 1865. Caswell was a good husband. Always understood that his wife deserted him. She has lived separate and apart from him since she left him, December, 1865."

To show that this man Bixby was a willing and guilty party in this infamous fraud, it is only necessary to refer to the part he took afterward in misleading and deceiving appellee.

Hearing nothing further from her husband, appellee on March 30, 1869, wrote to Bixby, who was, as she supposed, a friend, having acted as groomsman at her wedding, as follows: "Mr. Bixby, Sir:—Will you be so kind to let me know when you heard from my husband, D. H. Caswell, and send me his address and oblige his wife and child, also his mother;" to which letter Bixby replied as follows:

"DECATUR, April 11, 1869.

"MRS. CASWELL:

"Your note of inquiry of 31st March is received. In reply I can only say that some four or five months since Dan left this place as he said to go to Mexico, to what part he did not know, but would write me as soon as he found a permanent stopping place, but as yet have heard nothing from him. I expect to hear from him as soon as he is located.

Caswell v. Caswell.

"Will let you know as soon as I hear from him, or I presume he will write you when he knows where he will locate.

"Yours very truly,

"A. F. BIXBY."

And again, on August 5th, in answer to a further inquiry from appellee, he writes the following answer:

"DECATUR, August 5, 1869.

"MRS. CASWELL:

"Your note of inquiry of the first instance is received. As to Mr. Caswell's whereabouts I am unable to give you the least information. The last I saw of him was in Decatur, and he then informed me that he was going to Mexico. Did not say whether alone or with others, promising to write me when pe m nently located. I asked him when he thought of returning and he said never. I says, you are joking. No, he says, I am not. Taylorville is about forty miles from Decatur. I may go down there some time, and if so, I will see what I can learn and let you know the result of my investigation. I have already written to friend Brown what I know in answer to a letter from him. My respects to all.

"Yours truly,

"A. F. BIXBY."

Upon the testimony of appellant and Bixby alone, a decree of divorce was rendered at the September term, 1869, of the Piatt Circuit Court.

Appellant having now accomplished his purpose of procuring a divorce from appellee, desiring that she should know the fact, but be kept in ignorance of the charge upon which it had been procured, the means used or the place where it had been granted, proceeded to Evansville, Indiana, and there writes to appellee the following letter:

EVANSVILLE, INDIANA, October 27, 1869.

"Mary:—I am now prepared to let you know the reason of my long silence is absence from the country, and I also have to inform you that by the laws of this State, I have procured a divorce from you, on the ground of incompatibility of temper and disposition, and hereafter I hold myself free from you forever. Before this reaches you I shall be on my way back

to Mexico; so you need not expect to see or hear from me again.                                "Yours,

"D. H. CASWELL."

Upon receipt of this letter appellee caused search to be made in Indiana, and became satisfied that no decree had been granted by the courts of that State. It appears from the evidence that from this date up to 1881 appellee never again heard from, or of her husband. She states that she was in poor health and without property or means of support for herself and her daughter Catharine, except her daily labor; that she fully believed appellant had gone to Mexico; and that she was constantly during those years using every effort within her power to get some trace of him. In August, 1881, appellee, in looking over a directory of Nashville, Tennessee, discovered appellant's name and address, and at once wrote to him, and received an answer dated September, 1881, saying that he was surprised that she should address him as her husband, for, he says: "You well know that some twelve years ago I procured a divorce by law, and legally as the law directs, so you have no claim on me whatever."

Hoping to be able to go to Nashville, to see her husband, upon such means as she might save out of her earnings, she waited until the spring of 1883, when, finding it impossible to obtain the necessary funds in this way, she borrowed money and went to Nashville, saw her husband, and for the first time satisfied herself that there had been a decree of divorce pronounced against her, and the place where it occurred.

She swears that she saw at that time a copy of the decree as rendered by the Piatt Circuit Court in 1869, and that up to that time she had no knowledge outside of her husband's letters, *supra*, of the fact that a divorce had been granted, and no information, or even suspicion, of the court rendering it.

Returning to New York, as soon as she could obtain the necessary means to do so, she came to Illinois, and filed the bill in this case in the Piatt Circuit Court on the 22d day of December, 1883, giving a history of the divorce proceedings, including bill, evidence and decree, and alleging that such decree was obtained by fraud, and praying that the same might be canceled and annulled.

Appellant appeared, answered the bill, and was examined as a witness in his own behalf. Upon a final hearing the court below found the facts charged in appellee's bill to be true, and decreed that the said decree of divorce obtained in 1869 by said appellant in the said court should be and was thereby declared to be annulled, set aside, and to stand impeached and forever void. A bare reading of the foregoing facts is enough, we think, to satisfy any candid mind that the divorce proceedings, from first to last, were conceived in sin, and brought forth in iniquity. That it was not only a fraud practiced upon appellee, but upon the court, which was made use of to accomplish the wicked designs of appellant.

It may well be questioned whether, in the divorce proceedings, the court ever obtained jurisdiction of the person of appellee. She was not a non-resident at that time, for her husband had his residence in Illinois, and she was only absent temporarily, with his consent, and in such cases her residence or domicile would be the same as his. This we take it, is the uniform rule where husband and wife are living in harmony with their marital duties, though they may be residing temporarily in different jurisdictions.

But without expressly deciding this question, we have no doubt that the false affidavit, bill and evidence, together with the purpose, deliberately formed, and fully and successfully consummated by fraud and deceit, to prevent appellee from having any knowledge of the suit, and to impose upon the court, was such a fraud as to render the decree of divorce absolutely null and void, when attacked directly by bill, as in this case. Adams v. Adams, 51 N. H. 388; Edson v. Edson, 108 Mass. 590; Sloan v. Sloan, 102 Ill. 581.

The great lapse of time since the rendition of the decree of divorce, and the hardship of declaring it void upon the wife and children of the second marriage, have been urged upon us with great ability, as a reason why the original decree should not be disturbed.

These considerations are entitled to great weight, and it would afford us great satisfaction to protect all the innocent sufferers of this fraud, from the sad consequences that must

inevitably fall upon some of them. But that is impossible. If appellee is refused relief, herself and child are cruelly wronged without fault, and without a hearing. While on the other hand, if this decree is sustained, the innocent children of appellant must suffer for his wrong.

While these consequences are ample reasons for the most careful deliberation, they are none why the law applicable to the case when determined from the best light attainable, should not be announced and enforced.

The law is, as we understand, that mere lapse of time is no bar to bringing a bill of review to impeach a former decree for fraud, when the proof of fraud is clear, and there are cogent and convincing reasons given for the delay. Adams v. Adams, 51 N. H. 388; Sloan v. Sloan, 102 Ill. 581; Edson v. Edson, 108 Mass. 590.

We think appellee has given the most cogent and convincing reasons for the delay on her part. By the Evansville letter of October 22, 1869, she was led to believe a divorce had been obtained, if at all, in Indiana. She at once caused such search to be made as satisfied her that this statement was untrue. Then for nearly twelve years she believed her husband had deserted her and gone to Mexico, and during this time she seems to have availed herself of every resource at her command to find him. When, in 1881, she discovered him at Nashville, and wrote to him, he, in his answer, studiously avoids all reference to the place where the decree was obtained, and she remained in ignorance of it until she procured a copy of the decree at Nashville, in 1883.

The delay from 1881 to 1883 in going to Nashville to see appellant, is fully excused by her illness. and want of means. And it can not be said that the delay of some seven or eight months in filing this bill, after discovering that a decree of divorce had, in fact, been obtained, and the place of its rendition was unreasonable, when the distance she resided from Illinois, and that her only means were to be obtained by her own labor, are considered.

"No *laches* can arise from delay in taking steps to undo a fraud, until after knowledge of the fraud has been acquired." Jones v. Lloyd, 117 Ill. 597.

Caswell v. Caswell.

Appellant insists that Sec. 19, Chap. 22, R. S., controls this case, and that in all cases where there is no personal service, three years after the decree is rendered is the limit within which it can be attacked, even for fraud in its procurement; and cites Lawrence v. Lawrence, 73 Ill. 577, as sustaining this view.

We do not understand such to be the doctrine announced in that case. No question of fraud was made in the case, but the question was, did section 19 of the Chancery Practice Act, apply to decrees of divorce so as to make a decree, obtained upon constructive notice, binding and conclusive upon a defendant not personally served, after three years, unless application was made within such time to open it up for a new hearing, and the court held that it did. Such would be the rule when the proceedings were strictly regular, fair and truthful, even in such cases a complainant would, by the rule announced by the foregoing case, be required to wait three years before the decree would become confirmed and final against the defendant.

But that a decree may be attacked for fraud in its procurement, even after the five years allowed for suing out a writ of error, when cogent and convincing reasons are shown for the delay, is held in Sloan v. Sloan, *supra.*

We think the section referred to, has no application when a decree is sought to be impeached for fraud.

The Circuit Court committed no error in refusing to entertain the petition to transfer this cause to the Federal Court, as it was not, in our judgment, such a cause as could be removed.

The additional abstract filed by appellee was necessary, and the costs thereof should be taxed against appellant.

A majority of the court believing the decree entered by the Circuit Court to be right, and sustained by the proofs, it will be affirmed.

*Decree affirmed.*