RANDOLPH JONES *et al.*

*v.*

JOHN LLOYD *et al.*

*Filed at Ottawa May 15, 1886.*

1. STATUTE OF FRAUDS—*of a writing to meet the requirements of the statute.* Where the Statute of Frauds is set up in defence to a bill to enforce the performance of a verbal agreement for the conveyance of land, the answer of the defendant to a prior bill, filed by the other party, signed by the defendant himself or by his attorney for him, setting up the same contract fully, without pleading the statute, if introduced in evidence to prove the contract will meet the requirement of the statute, and entitle the complainant to enforce the contract.

2. TRUSTS AND TRUSTEES—*when a trust arises.* A father, owning a half section of land with an incumbrance upon it, entered into an agreement with his son-in-law, and the holder of the incumbrance, under which the land was conveyed to the creditor as a security, and the son-in-law was given possession of the land, who agreed to pay off the incumbrance from the rents and profits, he having ten years in which to pay the same. The son-in-law also agreed to furnish the father-in-law a home and support as long as he lived, and furnish a home to his minor children, and upon payment of the debt and receiving a deed from the creditor, he was to convey one-quarter of the land to the two minor sons of his father-in-law, they to remain and work on the place in the meantime: *Held,* that as soon as the rents and profits of the land should amount to a sufficient sum, it was the duty of the son-in-law to have paid the incumbrance and taken a deed from the creditor, and that when he obtained the deed, the two sons having worked for him about ten years each, he held the legal title to one-quarter of the land in trust for them, and in his subsequent dealings with them was subject to the obligations and duties of a trustee.

3. SAME—*dealings between trustee and cestui que trust—elements of fairness required.* A release by a *cestui que trust* will not be binding unless he is first made fully acquainted with his rights, and the nature and full extent of the liabilities of the trustee. Any concealment, misrepresentation, or other fraudulent conduct, on the part of the trustee, will vitiate such a release.

4. SAME—*burden of proof as to fairness of transaction.* Where a trustee sets up a bargain with his *cestui que trust,* or a release from him, the burden of proof is upon the former to vindicate the transaction from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect.

5. SAME—*the particular case.* A person holding the legal title to a quarter section of land in trust for his two brothers-in-law, who were justly and equitably entitled .to the same long before, by false representation and artifice, aided by his wife and a shrewd lawyer, made the *cestuis que trust* believe they were entitled to nothing, and induced them, in ignorance of the real facts and of their rights, to accept a deed for only eighty acres of the land, pretending this was a gift, and induced them to give a release in full, under the impression that the instrument executed by them was a different thing. It was *held,* that such release so obtained was no bar to a bill by his brothers-in-law to compel such trustee to make a conveyance of the other eighty acres of the land.

6. LACHES—*on bill to set aside release for fraud. Laches* will not be imputed to a party from a delay to take steps to undo a fraud, until after knowledge of the fraud has been acquired. So where two *cestuis que trust,* in ignorance of their rights, and upon the false statements of their trustee, released him in April, 1874, and did not discover the real facts, nor learn of the fraud practiced on them until in the fall of 1879, and filed their bill to set aside their release and for other relief, in January, 1880, it was *held,* there was not such *laches* as to bar equitable relief.

WRIT OF ERROR to the Circuit Court of De Kalb county; the Hon. C. W. UPTON, Judge, presiding.

Messrs. JONES & BISHOP, for the plaintiffs in error:

The answer of John Lloyd and wife, set up by them in the case of *Jones* v. *Lloyd et al.,* is a sufficient statement in writing to take this case out of the Statute of Frauds. 80 Ill. 541.

A grantee may declare a trust in a separate deed or instrument in writing signed by him, or in an answer in chancery in a suit concerning the property to which the trustee is a party. *McLaurie* v. *Partlow,* 53 Ill. 341; *Kingsbury* v. *Burnside,* 58 id. 328; *McConnell* v. *Brillhart,* 17 id. 354; *Malin* v. *Malin,* 1 Wend. 626; *Jackson* v. *Miner,* 6 Cow. 706; 56 Ill. 231.

Lloyd's statement to the complainants, in 1866, that they should each have their eighty acres of land if they worked their time out, and their doing so upon the faith of such statement, now estops Lloyd to set up the Statute of Frauds, or John H. P. Jones' alleged non-performance of his part of said contract. *Telegraph Co.* v. *Railroad Co.* 86 Ill. 246;

Herman on Estoppel, sec. 462, ed. 1871; Willard's Equity, p. 285, sec. 2, and p. 283; *Rhodes* v. *R.* 3 Sandf. Ch. 279; *Newton* v. *S.* 8 N..H. 9; *Miller* v. *McM.* 57 Ill. 126.

A deed of release by *cestuis que trust* to their trustees, must be made with full information of all the circumstances, and of the full extent of the liability of the trustees. *Leonard* v. *Leonard,* 3 Swanst. 1; *Jarvas* v. *Duke,* 2 B. & B. 171; *Cann* v. *Cann,* 1 P. Wms. 727; *Brodenck* v. *B.* id. 239; *Gordon* v. *G.* 3 Swanst, 400; id. 73; 1 Vern. 19; Hill on Trustees, (Am. notes,) 790.

Where confidence is reasonably reposed, that confidence must not be abused. The party relied upon must see that he meets fully and fairly the responsibility of his position, and does not take any advantage, either to the injury of another, or for his own gain. *Casey* v. *Casey,* 14 Ill. 112; *Dennis* v. *Cagg,* 32 id. 429; *Ullich* v. *Muhlke,* 51 id. 499; *Wheland* v. *W.* 3 Cow. 537; *McDoald* v. *F.* 1 Gilm. 269; *Ward* v. *Armstrong,* 84 Ill. 151.

Mr. D. J. Carnes, for the defendants in error.

Mr. Justice Magruder delivered the opinion of the Court:

On January 1, 1862, John H. P. Jones, father of plaintiffs in error, and, also, father of the defendant in error, Rebecca Lloyd, was indebted to Hannah Miller in the sum of $2330.30, and was the owner of the north half of section 27, town 41, range 3 east of third P. M., in De Kalb county, which three hundred and twenty acres was, then, worth about $20 per acre. The defendant in error, John Lloyd, at the same time, had a claim upon the three hundred and twenty acres, growing out of some previous sale, or attempted sale thereof, to him, by his father-in-law. On that day, Jones and Lloyd both executed deeds to Hannah Miller, and the legal title to the property was thereby placed in her. By an agreement between the three, Lloyd was to take possession of the land,

as his own, and have the rents and profits, and, out of the same, pay the taxes, and also pay to Hannah Miller the $2330.30, with interest at the rate of ten per cent per annum, payable annually, as soon as he was able and on or before January 2, 1872. Hannah Miller agreed, that she would convey the premises to Lloyd upon the payment of her debt and interest within the ten years, or on or before January 2, 1872. John H. P. Jones agreed, that he would contribute towards the payment of the debt to Miller out of such moneys, as he might earn by his practice, as a physician, and that his two minor sons, Oliver, then about fifteen years old, and Randolph, then about twelve years old, the plaintiffs in error herein, should live with Lloyd and work for him, "until said premises were paid for, or they became of age." As a part of the same arrangement, Lloyd, also, then and there, agreed, that he would furnish a home to the minor children of John H. P. Jones during their minority, and to Jones himself during his lifetime, and would also support the said Jones, when unable to support himself, as long as he lived, and, upon obtaining the deed of the three hundred and twenty acres from Hannah Miller, would convey the west half thereof, being the north-west quarter of the section, containing one hundred and sixty acres, to the two minor sons of John H. P. Jones, who are the plaintiffs in error in this case. A more detailed statement of this transaction and substantially the same, as that here recited, may be found in *Jones* v. *Miller*, 44 Ill. 181.

This is a bill, filed, in the circuit court of DeKalb county, by the plaintiffs in error, to compel a conveyance to them, or to Randolph Jones, of the south half of said north-west quarter, the north half thereof having been already conveyed to Oliver Jones, as hereinafter set forth. Upon final hearing, the circuit court dismissed the bill for want of equity, and the case is brought to this court by writ of error, issued here-from, for the purpose of reviewing such decree of dismissal.

It is insisted, that the agreement to convey the one hundred and sixty acres to plaintiffs in error can not be enforced, because it was not in writing, and is, therefore, void, under the Statute of Frauds. This objection is without force, under the circumstances of this case. At the November term 1864, of the DeKalb county circuit court, and in the case of *Jones* v. *Miller et al.*, above referred to, which was before this court at the April term 1867, the defendants in error herein, who were co-defendants with Miller in that case, filed an answer, in which they admitted and set up, at length, the agreement between Hannah Miller, John H. P. Jones and John Lloyd, as the same is above detailed. That answer, in the old suit, was introduced in evidence, upon the trial of this present suit, in the court below. It purports to have been signed by "John Lloyd and Catherine Rebecca Lloyd, defendants," and, if not signed by them in person, was signed by their attorneys for them. We think, that the statement of the agreement therein, meets the requirement of the statute. (*McLaurie et al.* v. *Partlow*, 53 Ill. 340; *Kingsbury* v. *Burnside et al.* 58 id. 310; *McConnell* v. *Brillhart*, 17 id. 354.) The agreement was there set up by the defendants, "without, at the same time, interposing the Statute of Frauds, as a defence." Pomeroy on Specific Performance of Contracts, sec. 140.

Moreover, in *Jones* v. *Miller et al. supra*, which was a suit between defendants in error on the one side, and the ancestor of plaintiffs in error on the other, the agreement, as here recited, with some slight variations in the details, was actually found by this court to have been executed between the parties, here mentioned. We there say: "If Lloyd refuses to perform his part of this contract, Jones can pursue his legal remedies under the new agreement." If such a course was open to Jones, it is not perceived why the same course is not now open to the two sons of Jones, who were beneficiaries in the trust, created by "the new agreement."

The evidence shows, that the defendant in error, John Lloyd, has failed to keep his contract. He did not furnish his father-in-law, John H. P. Jones, with a home or with support, as he agreed to do. Jones did not live with Lloyd after the fall of 1866. About that time, when he was between sixty and seventy years old, he was ordered by Lloyd to pack up and go. From some time in 1866 to March 1877, when he died, he had no home with Lloyd, and received no support from him. During this period, while he was old and feeble and lame, he lived in a number of places and with a number of persons. Numerous appeals were made, on his behalf, to Lloyd for help, but none of them were listened to. The proof is clear, that during the last ten years of his life, the old man was in the poorest possible circumstances financially. Lloyd does not claim, that he aided him in any way, after his leaving, except in the matter of clothing. He also admits, that the support of Jones would have cost from $150 to $200 per year. By discarding him, therefore, from 1867 to 1877, he saved some $1500 or thereabouts.

Lloyd did not keep his contract by furnishing a home to the minor children of Jones during their minority. The daughter, Sarah, staid only a few weeks, and then went off to work for her living. In 1866, Ambrosine, the youngest daughter, who was then only twelve years old, was compelled to leave Lloyd's house, and work first in one family and then in another. She continued so to work and earn her own support, during the remaining six years of her minority. Whenever she returned to Lloyd's house, she was reminded, that she should seek a situation elsewhere. The cost of her support could not have been less than $100 per year, so that her brother-in-law saved at least $600 by her leaving.

Lloyd has failed utterly to keep his contract, so far as plaintiffs in error are concerned, and his conduct towards them has been marked by the grossest fraud and deception. He was not obliged to wait ten years before paying Mrs. Miller.

Her debt was payable *on or before* January 2, 1872. He was to appropriate the rents and profits of the farm towards the payment of her debt, and to discharge it "*as soon as he was able* out of the rents," etc. He should not have used the rents and profits for any other purpose than to pay off the $2330.30. The plaintiffs in error were to live with him and work for him "until said premises were paid for, or they became of age." He claims, that, in the fall of 1872, he still owed Mrs. Miller $1100. If this was so, it was because he used the income of the farm for other purposes, and with the apparent intention of keeping the plaintiffs in error at work for him as long as possible. When he took possession of the three hundred and twenty acres in 1862, he had but little property of his own. At that time, Jones had considerable personal property upon the three hundred and twenty acres, nearly all of which was used and absorbed by Lloyd and his family.

The work of plaintiffs in error relieved Lloyd of the necessity of employing other labor except during harvest. The rental value of the farm per year was from $3 to $3.50 an acre. Lloyd had no other source of income from 1862 to 1873, than that which he derived from the three hundred and twenty acres. During this period, and beginning as early as 1867, he bought eighty acres at Malta and improved it; he bought five acres of timberland; he built a house, that qost $1000; he put up new barns and moved old ones; he built a horse stable, a cow stable, a hay barn; he also built fences and, partly, with material, owned by Jones; he had a large stock of horses and cattle, raised on the place; he raised two or three car-loads of hogs each year, starting with the hogs left there by his father-in-law. It is clear, that he could have paid Mrs. Miller, out of the rents and profits of the three hundred and twenty acres, long before 1872, if he had chosen to do so. As soon as he paid her and received a deed from

her, it was his duty to convey the north-west quarter of the tract to plaintiffs in error.

He induced plaintiffs in error to believe, that he could not get a deed, until after the expiration of ten years, and that they were bound to work for him for ten years, before they would be entitled to receive their one hundred and sixty acres. Oliver worked for him full ten years, beginning in 1862, when he was fifteen years old, and ending in 1873, when he was twenty-six years old. He was absent in the army one year, and, upon his return, was required to work an extra year to make up for the lost time. While away, he sent home $500, bounty money, of which Lloyd and his wife took possession, and of which he received back only $280. Randolph, also, worked for Lloyd ten years, with the exception of about six months.

During the long period of their service, the plaintiffs in error received no compensation whatever. They were not encouraged to attend school, and seem to have been purposely kept in ignorance. Oliver can neither read nor write. Randolph can write his name, but can not read writing. According to the testimony in the record, in reference to the wages, usually paid to farm laborers, the average yearly value of the services of plaintiffs in error was, at the lowest estimate, $150 for Oliver, and $100 for Randolph. Accordingly, the work, done by them both during the ten years, saved Lloyd a total expenditure of at least $2500 for labor.

Plaintiffs in error, though evidently not informed as to the details of the arrangement between their father and Lloyd, were aware, that they were to receive eighty acres apiece, and they worked and waited for their reward, and expected it at the end of ten years. In 1867, having been told by one Tallmadge, that Lloyd would play them false and not give them the one hundred and sixty acres, they applied to Lloyd to know if this was true, and stated to him, that, if it was true, they would quit working for him, and go elsewhere. They

both swear, and their statements bear all the marks of being true, that Lloyd then told them to continue their work, and he would give them eighty acres apiece, as he had agreed to do. He thereby renewed the original agreement, made on their behalf by their father in 1862. They continued in the active performance of the agreement, as thus renewed, for more than five years after 1867, and during all this period, maintained a joint possession with Lloyd of the premises, for which they were laboring.

On April 3, 1874, he held the legal title to the north-west quarter of the section, in trust for plaintiffs in error. He stood to them in the relation of a trustee to his *cestuis que trustent.* His obligations and duties were such as grow out of such a relation of trust. On that day, he and his wife and Oliver and Randolph rode to the county seat together in a carriage, and went to the office of a lawyer who had been one of the attorneys of Lloyd in the old litigation with his father-in-law, and whose bias and interest were all on Lloyd's side. This attorney was familiar with the terms of the agreement between Lloyd and Jones, and seemed to have prepared himself in advance for the interview, because he says, that he had before him the files in the old suit, and, among them, the answer, above referred to, in which the agreement was set forth.

Plaintiffs in error expected their deed for the one hundred and sixty acres. Instead of this, Lloyd and his attorney told them, that all the interest and claim of their father, under the contract, had been "wiped out;" that they were really entitled to receive nothing, but that Lloyd, in consideration of their having been "good boys," would give them one eighty-acre tract. Lloyd and his attorney then proposed to plaintiffs in error, that Lloyd should convey the north half of the north-west quarter of the section to Oliver, and that Oliver should execute a mortgage thereon to secure the payment of his note to Randolph for $1000, payable in four installments in Janu-

ary 1875, 1876, 1877 and 1878. In other words, the proposition was to give Oliver the title to eighty acres, and give Randolph a mortgage on Oliver's eighty acres to be paid by Oliver himself. The bare statement of the proposition indicates its unfairness and injustice.

Plaintiffs in error both swear, that the arrangement in question was never proposed to them, and they had never heard of it, until the meeting took place at the attorney's office on April 3, 1874. Lloyd states, with indefiniteness and hesitancy, that he made the proposition to his brothers-in-law in the fall of 1872, and they agreed to it at that time. They positively deny this, and we think their testimony is entitled to the greater weight. He also seeks to make it appear, that the settlement, upon the basis of one eighty-acre tract and a mortgage, was talked over among them, on that day, while they were riding to town. But Mrs. Lloyd herself says, that nothing was said on the subject during the ride. The admitted conduct of plaintiffs in error, when the proposed settlement was first broached to them, confirms their evidence upon this subject.

Randolph Jones was so overcome with astonishment and indignation at the sorry outcome of so many years of working and waiting, that he rose from his seat with impatience and left the room. It took the combined influence of his sister and brother-in-law and their attorney to bring him to terms. As he went out, saying that he would not take anything, the attorney told him "that will not do." His sister sneeringly remarked to him: "You are showing yourself nicely with your brother." His brother-in-law followed him out, and coaxed him, and told him that there was "no use in getting huffy," and urged upon him, that the claims of his father and of himself and his brother upon the land had all been "wiped out," and that what had been offered was offered "free gratis." While they were out, the attorney talked to Oliver, who had insisted, as soon as the arrangement was

proposed, that it had always been understood, that they were to have eighty acres apiece. Oliver finally concluded, and so said to his brother, upon the latter's return to the office with Lloyd, that, if, according to the statements made to them, they were legally entitled to nothing, they might as well take what they could get.

Accordingly, a deed was then and there made by Lloyd and his wife to Oliver Jones, conveying the north half of the north-west quarter; and notes for $1000 and a mortgage on the north half, securing the same, were executed by Oliver to Randolph. At the same time, plaintiffs in error were persuaded to execute to Lloyd a release of any demands, which they might have against him.

Plaintiffs in error swear, that the answer hereinbefore mentioned, which was referred to in the release, and the agreement set up in the answer, were not read to them at all, and that they knew nothing about their contents. They also swear, that they were unable to read the release, and were told, that it was merely an agreement to pay one-third of the costs of any suit, which their father might bring for the recovery of *their* land and Lloyd's land.

It is urged by defendants in error, that this release is a defence to the relief prayed for in this case. It can not, however, be allowed to have the effect, claimed for it, in view of the circumstances, under which it was executed. It was made by the beneficiaries in a trust at the instance of their trustee. In the matter of its procurement, Lloyd, the trustee, was bound, under the law, to act with the utmost fairness towards his ignorant and inexperienced brothers-in-law, the *cestuis que trustent.* He should have put them in possession of all the facts, surrounding the transaction, of which he himself had knowledge. He should have refrained from bringing to bear upon them any undue or improper influence.

"A release by the *cestuis que trust* will not be binding, unless the parties are made fully acquainted with their own

rights, and the nature and full extent of the liabilities of the trustee. Any concealment, misrepresentation, or other fraudulent conduct, will vitiate such a release. Therefore, a full statement of all the accounts and other transactions of the trustee should unquestionably be furnished to the *cestuis que trust,* together with all the information requisite for explaining and understanding them, and the burden is on the trustee to vindicate the bargain or gift from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect, and courts will scrutinize the transaction with great severity." Perry on Trusts, secs. 923, 428; Hill on Trustees, page *581.

An application of these principles to the facts, as disclosed in the record, will show, that Lloyd failed to do his duty, as the holder of an important trust. He kept for himself eighty acres of land, that belonged to the beneficiaries, whom he represented. He induced them to consent to his retention of their property, by stating to them that all their own claim to it and all their legal rights in it had been "wiped out." This statement was false. The grounds, which he urged in support of it, and which he pressed with such eagerness as to make them believe it, were, first, the alleged failure of their father to aid him in paying the Miller debt, second, the large expense he had been put to by the litigation, brought against him by their father, third, a yet unpaid balance upon the Miller debt, which it was difficult for him to discharge.

The contract, as set out in the old answer and as stated by this court in *Jones* v. *Miller et al. supra,* did not require John H. P. Jones to contribute any specified amount towards the payment of Mrs. Miller's debt. He was only to do what he could to help Lloyd in paying it off. He was unable to do anything, because Lloyd refused to give him a home and furnish him a support, in accordance with the original agreement. The earnings, which might have gone to pay the Miller mortgage, he was obliged to use in procuring for him-

self the home and support, which his son-in-law denied to him. His failure to aid in paying their common debt was the fault of Lloyd himself. Whatever loss Lloyd may have met with on account of such failure, was more than offset by the amount, which he was enabled to save by neglecting his father-in-law's support during the last ten years of the latter's life. All this should have been explained to the beneficiaries in this trust, when they were told, that their father had paid nothing on the Miller debt, and that, for this reason, they should release Lloyd from his obligations. No such explanation was given.

As to the expense, which Lloyd claims to have been put to by reason of litigation, instituted against him by his father-in-law, he is unable, in his testimony, to figure up, that such expense amounted to more than $235. This was more than offset by the amount, which his refusal to furnish a home, as he agreed to do, to Ambrosine Jones, his young sister-in-law, during the last six years of her minority, enabled him to save. He grossly exaggerated the amount of this expense to his brothers-in-law, when he was pleading with them to take one "eighty," instead of two "eighties." He failed to explain to them the damages, for which he would have been justly liable, if he had been called to account for his violated agreement in reference to their minor sister.

Again, he says, he told them that he could not give them more than eighty acres, because "the old man had put me to a good deal of expense, and this $1000 was back." If, at that time, the sum of $1000 was still unpaid upon the claim of Mrs. Miller—which does not appear, from all the evidence, to have been at all probable, or even possible—he should have told plaintiffs in error, in connection with the subject of such unpaid balance, that the Miller debt might have been paid years before that time, if he had applied the rents and profits of the farm to such payment, as he had agreed to do, instead of using them to make outside investments for himself. To

claim the sympathies of his brothers-in-law, on account of an unpaid indebtedness, which would not have existed but for his misuse of funds accumulated mainly by their own labors, was sheer hypocrisy.

Moreover, the manner, in which Lloyd obtained this release, subjects his conduct to the gravest suspicions. In procuring it, he purposely sought the assistance of his wife and his lawyer. The plaintiffs in error had lived with their elder sister, Mrs. Lloyd, for many years. They lost their mother in 1854, and, as we understand it, before they left Wales, their native country. They say and Mrs. Lloyd says, that they looked up to her, as a mother. Oliver says, that he had such implicit faith in his sister and her husband, that he believed what they told him about his rights under the agreement. When the statements of persons, whose relations to them were so close, and in whom they had so much confidence, were backed by the concurrence of a shrewd and well informed lawyer, it is easy to see what impression was made upon the minds of these ignorant and simple-hearted youths.

The settlement was made in April 1874 and this suit was brought in January 1880. It is said the delay in bringing the suit amounts to such *laches*, as ought to defeat the prayer for relief. Under ordinary circumstances, a delay of six years would constitute *laches* in such a case as this. But the proof shows, that plaintiffs in error did not discover the real facts, nor learn of the fraud, that had been practiced upon them, until the fall of 1879. No *laches* can arise from delay in taking steps to undo a fraud, until after knowledge of the fraud has been acquired.

The decree of the circuit court, dismissing the bill, is reversed, with directions to that court to enter a decree, requiring defendants in error to convey the south half of the northwest quarter, above described, to plaintiff in error, Randolph Jones, subject, however, to a lien thereon in favor of plaintiff in error, Oliver Jones, for the amount, paid by him to said

Randolph, upon the mortgage for $1000, executed upon the north half of the quarter section, and requiring defendant in error John Lloyd to account for the rents and profits of said south half, since April 3, 1874, and, if the said south half has been sold, then requiring said Lloyd to account for the value thereof on April 3 1874 and interest at six per cent per annum on the amount of such value.

*Decree reversed.*

SCOTT and SHELDON, JJ., dissent from this opinion.