[No. 1754, February 7, 1916.]
## HARRISON v. HARRISON.

### SYLLABUS BY THE COURT.

1. A guardian may acquit himself by an outside informal settlement with his ward, but the guardian who relies upon such a settlement must clearly show that he made a full disclosure of everything to the ward.

P. 379

2. The presence and assistance of an independent legal adviser, representing the ward, at the time of the settlement between guardian and ward, may, if the facts warrant, remove the imputation of undue influence by the guardian over the ward, but such independent counsel and advice will not relieve the guardian of the necessity of making a full disclosure, and, where a guardian settles with his ward and the ward is represented by counsel of his own selection, but the guardian fails to disclose facts not shown by his reports to the probate court, and of which the ward or his counsel have no knowledge, such release and settlement will be set aside, where it does not appear that the ward received substantially all that he was entitled to.

P. 381

3. Section 1845, Code 1915, construed. Held, that this section applies to the estate of an unmarried decedent, and that, under its terms and provisions, upon the death of an unmarried person, his estate goes to his parents, and if one of his parents be dead, the whole of his estate goes to the survivor.

P. 387

Appeal from District Court, Bernalillo County; H. F. Raynolds, Judge.

Action by Grover William Harrison against George W. Harrison. From a decree of dismissal, plaintiff appeals. Reversed and remanded.

Harrison v. Harrison, 21 N. M. 372.

CATRON & CATRON of Santa Fé, GEORGE D. HOWELL of Pittsburgh, Pa., and JOHN BARON BURG of Albuquerque, for appellant.

The guardian is liable for interest and annual rents. Secs. 1453, 1454, 1469, 1471, C. L. 1897.

No case goes to the extent of holding that relief will be refused where it is alleged that the settlement was made without an account at the time being produced, or showing the situation of the ward's property.

Woerner on Guard. 360; Shannon's Estate, 1 Phila. Rep. (Penna.) 299; 6 Lancaster Bar, 62 (Penna.); 8 Lancaster Bar, 108, (Penna); Hemphill, etc., v. Lewis, 7 Bush, (Ky.) 214.

Contract made by guardian with his ward, soon after latter comes of age, is looked upon with suspicion by the courts, and if procured by fraud, misrepresentation or undue influence, or if unfair to the ward, will be set aside.

Malone v. Kelly, 54 Ala. 532; Williams v. Davidson's Estate, 94 N. W. 1048; Berkmeyer v. Kellerman, 32 Ohio, 239, 30 Am. R. 577; McParland v. Larkin, 39 N. E. 609; Gale & Wisner v. Wells, 12 Barb. 84; Eberts v. Eberts, 55 Pa. 110; Spaulding v. Brant, 3 Md. Chan. 311; Meek v. Perry, 36 Miss. 190.

Burden of proving good faith rests on guardian.

Wade v. Lobdell, 4 Cush. 510 (Mass.); Sullivan v. Blackwell, 28 Miss. 737; Kinter's Appeal, Ferting's Estate, 62 Pa. 318.

To sustain private settlement, guardian must show that he fully and clearly disclosed condition of ward's estate at the time of settlement, and that it was fair and equitable.

Adams v. Reviere, 59 Ga. 793; Gillett v. Wiley, 126 Ill. 310; Huff v. Wolff, 48 Ill. App. 589; Roth's Estate, 150 Pa. 261; Beedle v. Small, 62 Ind. 26; Bruce v. Doolittle, 81 Ill. 103; Griffith v. Godey, 113 U. S. 89; Hart

v. Cannon, 133 N. C. 10; Estate of Dow, 133 Cal. 446; McConkey v. Cockey, 14 Atl. 465; Gregory v. Orr. 61 Miss. 307; Jackson v. Harris, 66 Ala. 565; Line et al. v. Lowder et al., 23 N. E. 758; Berkmeyer v. Kellerman, 32 Ohio, 239; Van Reeves v. Witzenberg, 112 Iowa, 30, 83 N. W. 787.

A tender back of what was received is not a condition precedent.

McParland v. Larkin, 155 Ill. 84; Leeson v. Anderson, 99 Mich. 247, 58 N. W. 72; Line v. Lawder, 23 N. E. 758; Vennard Estate, 50 La. Ann. 808; Rist v. Hartner, 44 La. Ann. 430.

Ward should not be sent to probate court to prove his claim.

Sledge v. Bone, 57 Miss. 222; Hagerty's Ex. v. Scott, 10 Tex. 525; Coleman v. Peckham, 136 Ind. 198; Johnson v. Miller, 33 Miss. 553; Lataillade v. Orena, 91 Cal. 565, 27 Pac. 924; Klemp v. Winter, 23 Kan. 492; Oldham v. Trimble, 15 Mo. 145; 36 Hun. (N. Y.) 497.

The appellant should have been adjudged the heir of his sister.

Sec. 2033 does not apply, nor is there other legislation which controls the question; hence a solution of the question depends on the common law.

Sec. 2871, C. L. 1897; Baker v. Mattocks, 69 ————; Guthrie's App., 37 Pa. St. 9; 2 Sutherland Stat. Const., secs. 453, 454; Sandoval v. Albright, 14 N. M. 345; Dye v. Cary, 12 N. M. 460; 2 Blackstone's Comm. 208, 212; 1 Chitty's Black., book 2, 167, 171; Sprague's Abridg. Black. 185, 186.

MANN & NICHOLAS of Albuquerque, for appellee.

Finding will not be disturbed if there is any substantial evidence to support same.

. Richardson v. Pierce, 14 N. M. 334; Eagle Mining Co. v. Hamilton, 14 N. M. 271; Hancock v. Beasley, 14 N. M. 239; Ortiz v. Bank, 12 N. M. 519; Marquez v. Land Co., 12 N. M. 445; Carpenter v. Lindauer, 12 N. M. 388; Rush v. Fletcher, 11 N. M. 555; Romero v. Coleman, 11 N. M. 533; Gale & Farr v. Salas, 11 N. M. 211; Patterson v. Hewett, 11 N. M. 1; Badaracco v. Badaracco, 10 N. M. 761; Torlina v. Torchlight, 6 N. M. 54; Romero v. Desmarais, 5 N. M. 142; Clark v. Gold Mining Co., 5 N. M. 356.

The settlement estops the ward from claiming anything further.

Brown v. Adkinson, 58 S. W. 524; Korn v. Exec. of Becker, 4 Atl. 434; Hoyt v. Spragle, 103 U. S. 596; Motley v. Motley, 45 Ala. 555; Buckner v. Buckner, 10 Ky. L. 78; Vaughn v. Bibb, 46 Ala. 153; Bickerstaff v. Marlin, 60 Miss. 509; Manning v. Banks, 62 Mo. App. 666; Kittredge v. Betton, 14 N. H. 40; Rhodes v. Robie, 9 App. Cases D. C. 305; Satterfield v. John, 53 Ala. 127; Adams v. Reviere, 59 Ga. 793; Feilder v. Harbison, 20 S. W. 508; Kirby v. Taylor, 6 Johns Ch. 242; Kirby v. Turner, Hopk. Ch. 309; Downing v. Smith, 4 Redf. Sur. (N. Y.) 310; Donaldson v. Donaldson, 1 Ohio S. & C. P. Dec. 239; Dunsford v. Brown, 19 S. C. 560.

Receipt in full by ward is valid though it is not shown ward had legal advice, or was advised by older persons.

Kirby v. Taylor, 6 Johns. Chanc. 242; 21· Cyc. 170; 8 Cyc. 504; Smith v. Smith, 91 Am. Dec. 761; Gratz's Executors v. Cohen, 11 How. 1; Harper v. Taylor, 193 Fed. 944; Adams v. Hopkins, (Cal.) 69 Pac. 228; Griswold· v. Pierate, 110 Cal. 259, 42 Pac. 820; Lamphear v. Ketcham, 37 Pac. 119; U. S. v. Choteau, 102 U. S. 603, 26 L. Ed. 246.

Compromise will not be set aside because ward's counsel made a mistake as to the law.

Georgia Home Ins. Co. v. Wharton, 113 Ala. 479, 59 Am. St. Rep. 129; Kleinman v. Geiselmann, 114 Mo. 437,

35 Am. St. Rep. 761; Dunn v. Com.; 8 Fed. Cas. No. 4174; Territory v. Newhall, 15 N. M. 141, 103 Pac. 982; Dye v. Crary, 13 N. M. 439.

Appellant did not inherit estate of his deceased sister. Sec. 2033, C. L. 1897.

### STATEMENT OF FACTS.

George W. Harrison, the appellee, was married to Guadalupe Perea Harrison, widow of Jose Leandro Perea, on the 2d day of September, 1885. Mrs. Harrison inherited considerable property from her former husband. There was born, as the issue of her marriage with Harrison, two children, Grover William Harrison, the appellant, and Maria Guadalupe Harrison. Grover was born March 31, 1887, and Maria October 17, 1889. Mrs. Harrison died October 22, 1889, survived by her husband and the two children named, possessed of a large separate estate. Maria, the daughter, died December 2, 1889, the owner of an undivided interest in the estate left by her mother. On the 6th day of January, 1890, the appellee was appointed administrator of the estate of Guadalupe Perea Harrison, his deceased wife, and duly qualified as such. Thereafter, on the 1st day of March, 1890, he filed an inventory, as such administrator, showing the total amount of assets coming into his hands, as such administrator, in the sum of $47,989.44. Thereafter, on December 31, 1894, said administrator filed a final report, in which he charged himself with a balance of $35,933.82. At approximately the same time that he took out letters of administration upon the estate of his deceased wife, he applied for and was granted letters of guardianship over the person and estate of his son, Grover. On the 7th day of January, 1895, appellee, as administrator, distributed to himself, as guardian of his son, the sum of $13,475, being his son's proportionate part of the moneys in his hands as such administrator, as shown by such final report. In 1898, said guardian filed the only report made by him to the probate court of Bernalillo county, as such

guardian, in which he charged himself with certain items, aggregating slightly more than $16,000.

At the time appellant became of age he was attending school in Chicago. His father came to visit him there, shortly before he arrived at his majority, and remained with him until after his twenty-first birthday. A day or two after the son reached his majority the father arrived at a settlement with him, by which he deeded to the son a piece of property in St. Louis, which he claimed was worth $13,500, but which is disputed by the son, and gave him two notes of no value, and obtained from the son a release in full, as such guardian. Some two or three months thereafter the son, becoming suspicious of the fairness of the settlement, took legal advice from a firm of Chicago attorneys, who corresponded with Hon. Neill B. Field, a reputable and reliable attorney of Albuquerque, N. M. Mr. Field, in pursuance of his employment through the Chicago attorneys, by letter to appellee, gave notice that the ward repudiated the release, and called upon the guardian to make full disclosure of all his transactions as such guardian. No report was ever made by the guardian to the court, save as above stated, nor was a report or statement submitted by the guardian to Mr. Field. Mr. Field caused an investigation to be made of the probate record in Bernalillo county, from which investigation, and personal knowledge which he possessed of one item properly chargeable against the guardian, he discovered that the guardian was indebted to the ward in the principal sum of $26,957.90. Mr. Field wrote the guardian a second letter, calling his attention to the various items making up the total, and saying that if he had in his possession anything which showed that his statement was not in accordance with the reports made by the guardian under oath, and other records made by him under oath; in petition for leave to sell, etc., that he would be glad to consider them. The guardian did not dispute the correctness of this statement, prepared by the attorney, but agreed with the attorney for the ward that he would pay $10,000 in cash and permit the ward to retain the title to the St.

Louis property in full settlement of the trust estate. This proposed settlement was communicated to the son, by the Chicago attorneys, and he agreed to accept the same. A formal release was prepared by the attorneys and signed by the ward, fully releasing the guardian, and ratifying all his acts as such.

At the time of Mrs. Harrison's death she was the owner of real estate in several counties within the territory of New Mexico. The guardian had applied to the probate court in these counties for permission to sell the ward's interest in the real estate therein situated, owned by his mother at the time of her death, which permission had been granted, the sales made and reported to the court in some instances in such counties, but no report of such sales had ever been made to the probate court in Bernalillo county. At the time the settlement was made with the guardian, through the attorneys above named, neither the ward nor such attorneys had any knowledge of some of such sales, and the guardian did not advise any of such parties of the facts relative thereto. About three years after the signing of the last release, this suit was instituted in the district court of Bernalillo county, to set aside the said release, and to require the guardian to make a full report of his acts and doings as such.

In his amended complaint, in addition to the above facts, appellant alleged that under the law of the territory of New Mexico, as it existed in the year 1889, when his sister died, he was the sole and only heir of his sister, Maria, and was entitled to the whole of her estate; that the same had been converted by his guardian to his own use, etc. To the amended complaint, a demurrer was interposed by appellee, upon the ground, among others, that it showed upon its face that the portion claimed as heir of Maria Guadalupe Harrison went to the father and not the appellant. The court sustained the demurrer to that portion of the amended complaint having reference to the estate left by Maria Guadalupe Harrison, deceased, and overruled it as to the other ground, whereupon the appellee answered, admitting some and denying other al-

legations of the amended complaint and setting up the stipulation and release. Trial was had to the court, without a jury, who found for the appellee, and entered a decree of dismissal, from which decree Grover William Harrison appeals.

## OPINION OF THE COURT.

ROBERTS, C. J. (after stating the facts as above)— The two principal questions presented for determination are: (1) Was the ward estopped by the release from claiming any further sum from the appellee, as his guardian? and (2) was the appellant the heir of his deceased sister, Maria Guadalupe Harrison? The questions will be discussed in the order stated.

[1] "A guardianship is a trust of the most sacred character, in which the guardian, or trustee, acts for one whom the law regards as unable to act for himself." National Surety Co. v. State, 181 Ind. 54, 103 N. E. 105. In the case now before the court, the guardian entered upon the discharge of his duties when his ward was but five years of age, and consequently the ward was without any knowledge whatever of his property interests. The trust estate was located in several different counties in the territory of New Mexico, and no one but the guardian had knowledge as to its situs, or value. He managed the estate until the ward arrived at his majority, without making proper reports of his doings in the premises. It is not contended by him that he ever disclosed to the ward, as he should have done, the knowledge which he possessed as to the estate, and his management and conduct of the same. That the first release which he exacted in Chicago, soon after the ward arrived at his majority, was invalid is unquestioned. That additional disclosures were made by the guardian prior to the execution of the second release is not claimed, but the argument is advanced that because the ward was represented by counsel, of his own selection, and acted upon their advice, he was dealing at arm's length with his former guardian, and therefore the release is binding, notwithstanding there was no disclosure by the guardian of his acts and doings as such and the condition of

the trust estate. It is true that in practically all of the cases—and they are very numerous—dealing with releases executed by wards soon after reaching their majority, the courts announce the doctrine that, from the confidential relation between the guardian and his ward, it will be presumed that the ward acts under the influence of the guardian, and all transactions and dealings between them, prejudicially affecting the interests of the ward, will be held to be constructively fraudulent; that this presumption continues even after the guardianship is ended, when the affairs of the guardianship have not been fully settled; that transactions between them, during the continuation of the presumed influence, which are injurious to the ward, will be set aside, unless shown to have been the deliberate act of the ward after full knowledge of his rights. In practically all the cases cited, the ward was unrepresented, and such releases were vacated because of the presumed influence exerted over the ward by his guardian. If this case turned upon such presumed influence, we would have no hesitancy in sustaining the validity of the release, for the son was distrustful and suspicious of his father and guardian and was represented by counsel of his own selection. In our judgment, there is a duty owing by the guardian to his ward before they can begin to deal with each other in relation to the affairs of the guardianship, and that duty is full disclosure of all the affairs of the guardianship by the guardian to his ward. In other words, the guardian must place his ward on an equal footing, by giving him all the information which he possesses, before the confidential relation can be severed and the guardian can deal with him at arm's length. To hold otherwise would be to lay down a rule by which a guardian or trustee could refuse to settle, at the termination of his trust, and compel the ward or cestui que trust to employ counsel, and then settle upon the basis of the information which the attorney was able to acquire by an examination of the record, however incomplete, and then claim immunity from after-discovered liability on the ground that the parties were dealing at arm's length. It may be argued

that the ward could compel an accounting and that the attorney, familiar as he is with the law, could compel an accounting before the settlement. It is true such an accounting could be required, but the law casts the affirmative duty upon the guardian of rendering a true and full accounting, and the courts will not sanction a rule which relieves him of this duty, or compels the ward to resort to the courts to compel an accounting before he can safely make a settlement with his guardian, and this duty is not lightened or dispensed with by the negligence of the ward. The guardian is an officer of the court, appointed to manage, control, and administer the estate of one, who, under the law, is incapable of managing his affairs. The estate through its courts takes possession of the property of the ward and exercises complete and exclusive control over the same. The law will not permit its agent, the guardian, to make a profit out of the trust, which it has confided t his management and control. It exacts from him absolute fidelity, and will be satisfied with nothing less. He cannot relieve himself from the obligations which the law lays upon him, except by a full and true accounting or a full and complete disclosure to the ward of all his acts and doings in the management of the trust estate. And even where there is a full disclosure to the ward, and the guardian secures from the ward a full release, without turning over to the ward all the property to which the ward is entitled, such releases are seldom ever held valid, and never supported, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward and the most abundant good faith on the part of the guardian. We know of no case where such a release has ever been upheld, without a full disclosure to the ward of all the material facts which he should know in order to enable him to arrive at a complete understanding of the condition of his estate.

[2] The presence and assistance of an independent legal adviser, representing the ward at the time of the settlement between the guardian and ward, may, if the facts warrant, remove the imputation of undue influence by

the guardian over the ward, but such independent counsel and advice will not relieve the guardian of the necessity of making a full disclosure.    In other words, the fact that the ward is represented by counsel will not warrant the guardian in concealing any material fact which the ward and his counsel should know to fully acquaint themselves with the true status of the trust estate.

"There may be such relations between the parties that silence, or the nondisclosure of a material fact, will be a fraudulent concealment.  If a person standing in a special relation of trust and confidence to another has information concerning property, and contracts with the other, and does not disclose his exclusive knowledge, the contract may be avoided, or he may be held as a constructive trustee."  Perry on Trusts, (6th ed.) § 178.

This doctrine is especially applicable to guardian and ward, and applies to principal and agent also, parent with child, ancestor with the heir, husband with his wife, trustee with his cestui que trust, partners with their copartners, and other similar trust relations.    Perry on Trusts, § 178, after enumerating the above and other similar trust relations to which the doctrine applies, says:

"If any of the parties above named propose to contract with the persons with whom they stand in such relations of trust and confidence, they must use the utmost good faith. It is not enough that they do not affirmatively misrepresent. They must not conceal; they must speak, and speak fully to every material fact known to them, or the contract will not be allowed to stand."

That the ward, or cestui que trust, or other party standing in a similar relation, is represented by an attorney at the time the contract is entered into would not relieve the party owing the duty of making a full disclosure from the performance of that duty which is cast upon him by reason of the trust relation.  After full disclosure is made, and thereby the parties are placed upon an equal footing, in so far as full knowledge is concerned, the presence of an attorney would, as we have stated, tend very strongly to remove the presumption of undue influence.

Pomeroy, in his work on Equity Jurisprudence, § 961, after announcing the general doctrine relative to the avoidance of contracts between guardian and ward, on the ground of presumed influence of the former over the latter, says:

"The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption."

It will be noted that the learned author says that all these elements must be established, in order to remove the presumption of undue influence of the guardian over the ward. It is our opinion that the guardian is under the imperative duty of making a full disclosure to the ward before he can contract for his release from any liability which rests upon him relative to the trust estate, and this duty he owes to the ward without regard to the presumption which the law raises as to the influence which the guardian may exercise over the ward. This is a positive duty which the law requires and exacts because of the legal relation which exists between the parties. In the case of Gregory v. Orr, 61 Miss. 307, the court, in discussing the question of release given by a ward to his guardian, said:

"The guardian who relies upon them must clearly show that he made a full disclosure of everything to the ward, and that the latter knew and understood that he was making a full and final settlement. It is not enough that the ward could have obtained the requisite information by the exertion even of ordinary care. It must be shown that it was laid before him, and that he knew what he was doing. It is not necessary to prove that the amount paid was actually the true amount due, but it is essential that the ward should have laid before him all the important facts and figures, and thereby allowed, with his eyes open, to decide whether he would accept the sum tendered him or not. The burden of showing that this was done and that the ward not only had opportunity to ascertain his rights, but understood that the settlement then being made was a final one, rests upon the guardian. The meager testimony in this case leaves it doubtful whether the wards were aware that they were making a final settlement, doubtful whether injustice

was not actually done them, and certain that the books and papers showing the past and present condition of the estate were not really laid before them."

In the case of Barton v. Fuson, 81 Iowa, 577, 47 N. W. 775, the court said:

"We are not prepared to say that a trustee in uberrima fides may not settle with his cestui que trust, and accept binding acquittances and receipts discharging him from all liability on account of the trust estate. But, to make such a transaction binding, it must be based upon an accounting and a disclosure by the trustee of the condition of the trust. There must be no concealment of matters connected therewith, and the cestui que trust must not ignorantly assent to the settlement when he would not have done so had the trustee disclosed all the facts to him."

See, also, to the same effect, Jones v. Lloyd, 117 Ill. 597, 7 N. E. 119; Womack v. Austin, 1 S. C. 421; Briers v. Hackney, 6 Ga. 419; Hatch v. Hatch, 9 Ves. Jr. 292, and see note to the case of Ellis v. Soper, 5 Probate Rep. Ann. 627, where many similar cases will be found cited.

In the case of In re Moore, 112 Me. 119, 90 Atl. 1088, it is held that a guardian, in settling with his ward and in accounting to the court, must make a full disclosure of all facts necessary to a complete understading of the transactions, and a failure so to do is a breach of trust. In the case of White v. Sherman, 168 Ill. 589, 48 N .E. 128, 61 Am. St. Rep. 132, it is said that: "Imperfect information will be regarded as equivalent to concealment." In the case of Smith v. Howlett, 29 App. Div. 182, 51 N. Y. Supp. 910, the court said:

"The trustee, before being relieved of his trust, must do exact justice to the cestui que trust; and until that is done the trust continues, and courts of equity will enforce the trust, no matter what form of writing or contract the trustee has induced the cestui que trust to enter into which absolves the trustee."

In the case of Jones v. Jones. 50 Hun. 603, 2 N. Y. Supp. 844, the court said that "actual and full knowledge is indispensable." In the case of Scoville v. Brock, 79 Vt. 449, 65 Atl. 577, 118 Am. St. Rep. 975, the court holds that it is essential that the ward be placed upon an equal

footing with the guardian before a contract or release will
be held binding, and that in order to do this the ward must
not only be advised as to all the facts, but must be in-
formed fully as to his legal rights. In the case of Ma-
lone v. Kelley, 54 Ala. 532, the cestui que trust had inde-
pendent advice. The court said:

"The opportunity for the exercise of undue influence, for a
violation of confidence, or for imposition, is lessened. The
probability that the transaction proceeds only from the spon-
taneity of the cestui que trust is increased. There must still
rest, however, on the trustee, the duty of furnishing full in-
formation, so that the independent advice the cestui que
trust may receive may be intelligently given."

Appellee has cited, in support of his contention that the
release executed by the ward to him is binding and valid,
the case of Brown v. Adkinson (Ky.) 58 S. W. 524. It
is true the release there was upheld, and that the ward
had independent legal advice, but there are two important
circumstances present there which do not exist in this
case. First, it appears that the guardian had made re-
ports to the probate court, which it is true were stated to
contain many errors, but it is not shown that the ward's
attorney could not have ascertained from such reports the
true condition of the estate; and, second, it did not ap-
pear that the ward was entitled to any substantial sum in
excess of that paid. Of course, if it were true that the
ward, without being fully informed, should settle with
his guardian and receive substantially all that he was en-
titled to upon a just and true accounting, a court of equity
would not set aside the release.

The case of Korn v. Executor of Becker, 40 N. J. Eq.
408, 4 Atl. 434, is also cited and relied upon by appellee.
In this case the ward was represented by counsel of her
own selection, and the validity of the release was upheld.
The distinction between that case and the one now before
the court is clearly shown by the following quotation from
the opinion:

"No fraud is proved, nor do the proofs show that any ad-
vantage was taken of the complainant in the settlement, or
that anything was withheld from her to which she was
justly entitled."

Appellee also cites the following cases in which releases by a ward to his guardian have been upheld: Hoyt v. Sprague, 103 U. S. 613, 26 L. Ed. 585; Manning v. Barks, 62 Mo. App. 666; Kittredge v. Benton, 14 N. H. 401; Rhodes v. Robie, 9 App. D. C. 305; Satterfield v. John, 53 Ala. 127; Adams v. Reviere, 59 Ga. 793; Fielder v. Harbinson, 93 Ky. 482, 20 S. W. 508; Kirby v. Taylor, 6 Johns. Ch. (N. Y.) 242; Kirby v. Turner, 1 Hopk. Ch. (N. Y.) 309; Downing v. Smith, 4 Redf. Sur. (N. Y..) 310; Donaldson v. Donaldson, 1 Ohio S. & C. P. Dec. 289; Dunsford v. Brown, 19 S. C. 560; Motley v. Motley, 45 Ala. 555; Buckner v. Buckner, 10 Ky. Law. Rep. 78; Vaughan v. Bibb, 46 Ala. 153; Bickerstaff v. Marlin, 60 Miss. 509, 45 Am. Rep. 418. In all these cases it will be found that the guardian either made full disclosure, or the information was contained in reports made by the guardian, or was easily accessible, or that the ward was paid substantially all that he was entitled to receive. The facts of the present case distinguished it from the autrorities upon which appellee relies to sustain the judgment of the trial court.

Appellee contends that the ward was paid substantially all that he was entitled to receive. The trial court was asked by him to find that such was true, and that full information was given the ward. This the court refused to do, and found only that the release was executed by the ward upon the advice of counsel of his own selection; that he was not acting under the influence of the guardian, but upon the advice of counsel; and that he was estopped by such release from requiring his guardian to further account. The facts in the case do not show, in our judgment, that the ward received all that he was justly entitled to, and the trial court was right in refusing to so find. The facts also show that full disclosure was not made by the guardian. Such being the case, the court should have required a full accounting, and should have entered judgment for the appellant for such amount as he was entitled to receive, less payments already made to him.

[3]   Whether Grover William Harrison was entitled to the estate of his deceased sister depends upon whether her estate was subject to the provisions of section 1845, Code 1915 (section 2033, C. L. 1897), or was governed by the common law.   Mrs. Guadalupe Perea de Harrison, wife of appellee, died in October, 1889, leaving surviving her, her husband and two children by him, Grover, the appellant, and Maria.   Maria died in December, 1889, intestate, unmarried and without issue, seised of an undivided three-eighths of her mother's estate.   Appellant, her only brother, claims to be her sole heir; while her father, the appellee, claims that under the statute he was entitled to the whole of her estate, which he distributed to himself as administrator of his wife's estate.   Section 1845, Code 1915, is as follows:

"If the intestate leave no issue, the whole of his estate shall go to his wife; if he leaves no wife, the portion which would have gone to her shall go to his parents.  If one of his parents be dead, the portion which would have gone to such deceased parent, shall go to the surviving parent."

This statute was in force at the date of Maria's death. It is conceded that the law in force at that time governs the distribution of her estate, and that under this section, standing alone, appellant would have no claim therein, and that appellee would take the whole.   It is contended, however, that this section must be construed in the light of former legislation upon the same subject and of the whole act of which it is a part, and that, when so construed, it relates only to the property belonging to married persons at the date of their death, or to persons who have been married; that we have no specific statute regulating the distribution and descent of property of persons who have never been married; that such property goes, therefore, to those persons designated by the common law as heirs; that at common law the father was not an heir; and that the brother under the facts in this case would take the estate.   The fundamental rule in construing statutes is to ascertain and give effect to the intention of the Legislature. This intention, however, must be the inten-

tion as expressed in the statute, itself, and where the meaning of the language used is plain, it must be given effect by the courts. This is a universal rule. 36 Cyc. 1106.

"The Legislature must be understood to mean what it has plainly expressed, and this excludes construction." Lewis' Sutherland Statutory Construction, § 366.

If regard be had to the plain language of this section of the statute, standing alone and segregated from the remainder of the act of which it formed a part, its meaning is clear. It first provides that where the intestate leave no issue, the whole of his estate shall go to his wife. This makes provision for the distribution of the estate of a decedent, leaving a husband or wife, and no children or their descendants. It presupposes the existence of the marital statutes, at the time of the death of the decedent. The section then proceeds:

"If he leave no wife, the portion which would have gone to her shall go to his parents."

The language just quoted plainly intended to provide for the distribution of the estate of an unmarried person, who died without issue. Appellant, by a very ingenious argument, based upon the prior laws upon the subject and the remainder of the act of which this statute formed a part, would construe the words quoted as applying only to the estate of one who had been married, and, as thus construed, we would have no statute providing for the descent and distribution of the estate of one who had never had a husband or wife, and hence we must resort to the common law to determine who would be entitled to the estate of such deceased person. For illustration, suppose that A. married B. in the year 1890. At the time of the marriage neither party owned any property. A.'s wife died shortly after the marriage, and at the time of her death neither owned any separate estate, and there was no community property and no children had been born unto them. After the death of his wife A. acquired property, never married, and dies. Upon his death his prop-

erty would be subject to distribution under the provisions of this statute. On the other hand, if he had never been married at all and died, owning property, it would not be subject to distribution under this statute, but would be governed by the provisions of the common law. We can see no reason for any such distinction, and do not believe that it was the intention of the Legislature to so provide. This statute was, we believe, intended to provide for the distribution of all estates where the decedent died, without issue, leaving a husband or wife surviving, or where there was no surviving spouse. Suppose, for further illustration, that there is a marriage status, and one party dies, and there are no children, and community property; the survivor would take the whole of the estate. But after the estate has become vested in the survivor, can it be said, with any degree of logic, that because it came through the marriage status, that it becomes so impressed with the community character that it retains such a peculiar status that it is subject to a special law of descent and distribution upon the death of the survivor? We do not believe so. Where a party dies the absolute and unconditional owner of property, we can see no good reason for saying that because a part of it was earned by the decedent, it shall descend in one manner, and because another part may have been derived by inheritance, or may have been a gift, that it shall descend in some other way.

The language of this section declares the law on the subject as it existed in New Mexico from the time of its acquisition by Spain where the civil law was the law of the land up to the passage of the act of 1887. The Kearny Code continued in force the civil law from September 22, 1846. Kearny Code (page 65, C. L. 1897). The Legislature in 1852 passed an act regulating descents and distribution (Laws 1851-52, p. 358), which was merely a re-enactment of the civil law on this subject in force at the time (C. L. 1884, §§ 1410-1422, 1431-1438). Under this law, parents were the sole heirs of their children, dying without issue or conjugal partners, whether at any time married or not, and brothers were not heirs. Sec-

tions 1415, 1436, 1418, C. L. 1884. The law of 1852 covered the whole law of descent and distribution and remained in force until February 24, 1887, when the Legislature passed an act, entitled "An act regulating descents and the apportionment of estates" (Laws 1887, p. 60), which repealed no specific law, but repealed all laws in conflict therewith. It conflicted with sections 1410 to 1422, inclusive, and sections 1431 to 1438, inclusive, C. L. 1884, the only law on the subject in force at the time, and therefore repealed them. This law purported to and did cover the whole law of descents and distribution. By section 3 thereof, where there were no brothers, or sisters or conjugal partner surviving the intestate, parents took the whole as formerly, but where there were brothers and sisters, the parents took only half, and the remaining half went to the brothers and sisters, or their heirs. This law remained in force until February 26, 1889, when the Legislature passed an act, entitled "An act to amend the laws relative to the estate of deceased persons." Laws 1889, c. 90. This repealed specifically the act of 1887, above referred to, and also sections 1410 to 1422 inclusive and sections 1431 to 1438, C. L. 1884, inclusive. These sections otherwise would have again become operative upon the repeal of the act of 1887. These were the only laws relating to descent and distribution in force in the territory at that time, and all of the sections repealed, except 1422, were a part of the law of 1852, and were the only part of that law regulating the descent and distribution of decedent's estates. Sections bearing the same numbers as the repealed sections 1410 to 1422, inclusive, were substituted for those sections, and the substituted sections were the only provisions with reference to descent and distribution enacted in the new law, and were therefore the only statutory laws in the territory on the subject at the date of the death of Maria. These sections are now sections 2030 to 2042, inclusive, of C. L. 1897. See chapter 29, Code 1915, and section 1413, C. L. 1884, is now section 2033, C. L. 1897, and section 1845, Code 1915, still in force, and is the section under which appellee claims.

Harrison v. Harrison, 21 N. M. 372.

Since 1852, it has not been necessary here to resort to either the civil or common law to determine who takes the property of decedents, whether married or single. We have had specific statutes providing for the division of all estates, whether those of married or single persons. Up to February, 1887, parents of a person dying without a surviving conjugal partner or descendants, whether such decedent had been at any time married or not, took the whole of the estate. From that date up to February 26, 1889, parents took the whole as formerly, unless there were brothers or sisters. In that event, half, whether or not the deceased had at any time been married or not. In 1889, the section in question was passed, It embodied the law as contained in sections 1415, 1436, 1437, C. L. 1884, the statutes under which parents, from 1852 to 1887, took the estate of a decedent, dying without issue, or conjugal partner, and also the civil law as it existed at the time we became a part of the United States. Its language is so plain and unambiguous that it needs no construction.

It is insisted that the Legislature intended by the law of 1889 to regulate only the distribution of estates of married persons, and to relegate us to the common law to ascertain who are entitled to the estates of persons who have never been married, notwithstanding the language of the act clearly includes all persons, whether married or single, and embodies the law as it had been since New Mexico became a political entity; that it made this radical change in our established system of descents and distribution without an intimation in express language that this was its intention and in spite of the use of language which specifically negatives that intention. The effect of this contention is that it was the intention of the Legislature to declare that parents, who had theretofore taken all of the estate of their children, dying without issue or surviving conjugal partner, should continue to take the whole if the decedent had been married, but should take none of it if the decedent had not been married, and that brothers, who had always been theretofore expressly ex-

cluded from participation in the estate where parents survived, whether the decedent had been married or not, should still be excluded from participation if the decedent had been married, but if unmarried, should take it all. In the absence of an express intention to make such a radical change in the law, the court will not impute such intention to the Legislature, especially when no reason either of public policy or justice can be given for it, and especially where the language of the act itself continues in force the settled law governing the descent and distribution of all estates, whether of married or unmarried persons. .

Appellee contends: That the section of the law of 1852 (section 1407, C. L. 1884), defining a division of the inheritance to be a distribution among the heirs in accordance with the will, or if there be no will, in accordance with the law, is still in force. That sections 1431-1438, a part of the same law, declaring who the heirs were, have been repealed. That the new law does not specifically state who are heirs. That therefore we are relegated to the common law to ascertain who the heirs are within the meaning of section 1407. He further contends: That section 1413, C. L. 1884, treated of distribution of acquest property. That, therefore, although that section was repealed, the substituted section, bearing the same number, must be held to treat of the same subject. These contentions seem to us to be without merit. The new law declares to whom the property shall go under the varying conditions which may exist at the date of the death of an intestate. It can make no difference in the division of an estate whether the Legislature in one section declares that parents are heirs under certain conditions, and in another section states that where those conditions exist, the heirs will take, or whether, without designating parents as heirs, it states that under certain conditions, parents shall take. The property will go to the persons designated by law, whether they are called heirs or not. It cannot be true that because in 1852, the Legislature declared certain persons to be heirs, and has since repealed that law,

we must go to the common law to ascertain - who the heirs are under section 1407, C. L. 1884, in the face of a later statutory provision declaring who shall take the property under certain conditions. That section provided for the distribution of the estate among the heirs as provided by law, and the same law provided who the heirs were. The heirs referred to in the sections were theretofore not common-law heirs, but such persons as were declared to be heirs by the Legislature. The repeal of the statute declaring who the heirs were at the time, and the passage of another declaring who shall take the intestate's estate, necessarily make the persons mentioned in the latter act the "heirs" within the meaning of section 1407, C. L. 1884. There is no basis for the contention that that word as used in that section must be construed to mean common-law heirs. It never had that meaning, and the substitution· of another law for the one in force at the time of its passage cannot give it that ·meaning:

The old sections 1410 to 1422, inclusive, C. L. 1884, as a whole, provided the method of distribution of the estates of all intestates, whether married or single. The subject was treated as a whole. The disposition of the property was not made to depend upon whether or not the property had received a fixed status before the death of the intestate, but upon the status of the intestate at the time of his death. It depended entirely upon the conditions which might exist at the time of his death. If he were married, leaving no children, but a wife, a certain disposition of it was made. If he were married, leaving children, but no wife, other disposition was made; if he were married and died leaving a wife and children, still another provision was made; if he left no children and no wife, a different disposition was made. In other words, it was not the status of the property which controlled its disposition, but the status of the intestate, at the date of his death. If this be the correct view, then no particular section of the old law treated of any particular kind of property, but the whole law provided how the estate of all intestates would be divided, the method of such division be-

ing dependent, not upon the status of the property, but upon the status of the intestate and the varying conditions which might exist at the time of his death. The old sections 1410-1422 did not declare who the heirs were. A resort to sections 1431-1438 was necessary to ascertain who they were. All these sections, taken together, made a complete system regulating the descent and distribution of all estates, and, as stated heretofore, were the only laws of that subject.

Sections 1431-1438 were repealed (Laws 1889, c. 90, § 49), and no others bearing their numbers were enacted, while sections 1410-1422 were also repealed, but new sections bearing the same numbers passed (Laws 1889, c. 90, § 21). The new sections covered not only the whole subject to which the old sections bearing those numbers related, but also that to which sections 1431-1438 related. These new sections not only provided how the estate should be divided under given circumstances, but also designated the persons who should take it.

The subject-matter treated of in old sections 1410, 1411, 1412, 1413, and 1414, is covered fully by new sections 1410 and 1411, and these new sections 1410 and 1411 also embody that portion of sections 1431 to 1438, designating the persons who should take under the conditions set forth in 1410-1414. The subject-matter of old sections 1415 and 1422 is covered by new section 1413, which designates as well the persons who shall take under the conditions mentioned. The subject-matter of old sections 1416-1421, has not been re-enacted. Provisions are contained in new sections 1410-1422 which were not in the old sections. The old statute was silent as to the disposition of life insurance. The new statute especially provides for its disposition. Illegitimate children were not mentioned in old sections 1410-1422, but were in sections 1431-1438. This subject is fully covered by new sections 1418, 1419, and 1420. Old section 1416 declares when parents and ascendants may disinherit their children; new section 1416 provides when uninherited property shall escheat to the territory. Old section 1417 relates to the disinheritance of

parents by their children; new section 1417 relates to posthumous children, not mentioned in any of the sections of the old law. Old section 1418 provides that brothers are not direct heirs, but giving them the right to contest the will under the conditions mentioned therein; new section 1418 declares when illegitimate children shall inherit. Old section 1419 declares that strangers shall lose their right to inherit bequeathed property in the circumstances mentioned; new section 1419 provides that where the relation of father and son has been mutually recognized where the son is illegitimate the father may inherit. Old section 1420 provides that the heir shall have the privilege of accepting the inheritance; new section 1420 provides that illegitimate children become legitimate by the marriage of their parents. The subject-matter of new sections 1418-1420 is not touched upon in old sections 1410-1422, but is covered in the repealed sections 1431-1438. Old section 1421 provides when the joint tenant takes the whole devised estate; new section 1421 gives to the widow all personal property which in her husband's hands would have been exempt from execution. Old section 1422 provided that when either conjugal partner died without legitimate children, the survivor takes all the acquest property; new section 1422 provides that the proceeds of life insurance is not subject to the debts of deceased except by contract. It will thus be seen that many subjects treated in the substituted sections were not mentioned in the old; that many of the provisions of the old sections have been repealed and not re-enacted in another form by the new; that the subject-matter of the new sections is different from the subject-matter of the old bearing the same number in almost every instance; and that whole subject matter of descents and distribution is covered by the new. There is no foundation for the contention that because a portion of the new act provides what disposition shall be made of his estate on the death of a married intestate, the whole law relates only to the disposition of property of married persons.

It is further argued in appellant's brief that because at

common law a husband was not an heir of his wife, it would not have been the intention of the Legislature to provide by this act that a father should inherit from a child whose estate consisted of property inherited from the mother, because this would in an indirect way make the husband the heir of the wife. The fallacy of this argument is readily seen when it is remembered that the act itself makes the husband the sole heir of the wife where there are no children, and the heir of the wife to the extent of one-quarter of her private property and share of the acquest property where there are children.

The trial court properly sustained the demurrer to that portion of appellant's complaint which sought a recovery of the estate left by his deceased sister. But for the error of the trial court in holding that appellant was estopped by his release from requiring a full accounting by his guardian, the cause must be reversed and remanded, for further proceedings consistent with the rules of law announced in this opinion; and it is so ordered.

HANNA and PARKER, J.J., concur.