331 P.2d 355

E. F. OSTERTAG, Administrator of the Estate of Josephine P. Holstein, sometimes known as Josephine Holstein Waterman, deceased, Plaintiff-Appellee,

v.

Harold E. DONOVAN, Defendant-Appellant.

No. 6444.

Supreme Court of New Mexico.

Oct. 27, 1958.

McAtee, Toulouse & Marchiondo, B. J. Stephens, Albuquerque, for appellant.

**8**

Robertson & Skinner, Raton, **for** appellee.

McGHEE, Justice.

The defendant, Dr. H. E. Donovan, prosecutes his appeal from a judgment for the plaintiff, E. F. Ostertag, administrator of the estate of Josephine P. Holstein, rescinding a gift to him of stock valued at $6,000 by the deceased while she was his patient in the Donovan Hospital at Raton, New Mexico.

The case was tried before the court without a jury, the court finding in substance that the decedent was so physically infirm, weak and emaciated as to be mentally susceptible to the influence of the defendant, who knowing the decedent's condition, that he had great influence over her, and that she trusted him, took advantage of that knowledge and by the exertion of undue influence induced the decedent to endorse and deliver to him the stock certificates in question without consideration at a time when she owed him nothing and was incapable, without independent disinterested advice, of attending to any business transactions of importance, or of making the stock transfer.

We are called upon fundamentally to decide whether there is substantial evidence to support the findings of the trial court, is above summarized.

█ In the view we take of the case, defendant's contention that the evidence is insufficient to support the court's findings in effect of mental incapacity in the decedent at the time of the transfer is not material to the decision since mental weakness or incapacity is incidental to transactions presumptively invalid where a fiduciary or confidential relation exists. Pomeroy, 3 Equity Jurisprudence 788–789, § 955 (5th ed. 1941) (hereinafter cited as Pomeroy); Matthaei v. Pownall, 1912, 235 Pa. 460, 84 A. 444.

█ Contrary to the defendant's second contention, we believe that under the facts of this case the trial court was justified in finding that the defendant doctor exerted undue influence on the decedent in obtaining the gift of the stock certificates. The facts surrounding the transfer are substantially as follows:

The patient, after the death of her husband, rented an apartment from the defendant doctor, located above the Donovan Hospital in Raton, New Mexico and there lived alone for many years until her entrance into the hospital October 29, 1954 where she died intestate February 25, 1956.

For many years prior to and continuing up to the time of her death, with one or two brief intermissions, the deceased was a patient of the defendant, who treated her almost continuously; he or other doctors made daily visits to her apartment; many meals were prepared and taken up to her; the nurses were under orders to care for

her as a member of the doctor's family and to many of them she was a hospital pet.

Doctor Donovan testified that when she entered the hospital in October of 1954, she was thin, weighing about seventy-five pounds, some five feet three inches in height, and was eighty-three years of age; that she had Parkinson's disease; that the symptoms manifested were tremors and nervousness, made worse by emotional upsets; that she also had conditions of chronic hypertension, nephritis, and arteriosclerosis due to age. Others stated she looked very frail as though she were just skin and bones, and that when she lay on the bed you could hardly tell where she was from where she wasn't.

Many witnesses, including the plaintiff, testified that the decedent had a good memory and mind, that she knew what she wanted to do, and was mentally alert until about a month before her death, but that perhaps due to her age and sickness there were times when she was so extremely nervous and upset that she could not write legibly nor talk so she could be understood, and that this condition got progressively worse during the last few months of her lifetime. They further stated that the decedent for many years had said everything she owned was to go to the doctor on her death; that the doctor was great and she would leave him everything, and that he was like a son to her.

The stock transfer complained of took place on October 25, 1955, about a year after her entrance into the hospital, and there is some evidence that the deceased was in good condition and mentally alert that day.

The only testimony of the actual transfer of the stock was that given by the doctor himself, although a nurse, later to become his wife, stated she was called in and acted as a witness. The doctor testified on direct examination as follows:

"* * * She was the second patient I saw on that morning and when I went into her room that morning she was very bright, very attentive and asked me if I would get the superintendent of nurses, Mrs. Stevenson and come back to her room, a little later that morning I told her that I would. I made the rounds to see the rest of the hospital patients, saw an office patient or two and then got Mrs. Stevenson and went back to her room. She asked me to shut the door and sit down, which we did. Then is when she said that she had been telling me all of the years that she was going to do something for me and that she had really appreciated all her time since she has known me in Raton all of the things I had done for her. That she had told me she was going to do something for me and she was ready at this time to do it. She asked me if

I wouldn't go into one corner of a room or the room where there was an old leather suitcase and bring it to her bedside table, which I did. She asked me to open it, which I did and remove from that a strong, small strong box. I removed this and put it on top of the bedside table and she asked me to open the drawer to her bedside table and give her a package of keys, which I did. She opened the box and removed from it the original of the stocks that we have seen the photostatic copies of today. I removed the strong box from the top of the bedside table. * * * And she showed those stocks to me and asked me if I would like to have them and I said, of course I would. She said, "Well you deserve them many times over," She said, "If you will fill your name in I will endorse them and Mrs. Stevenson can witness my signature. * * *"

Defendant stated he then went through the group, filled them in, and then the deceased signed and Mrs. Stevenson witnessed them; that he thanked her, and was very much surprised because he didn't know she had them, and then took them up to the office desk and locked them up.

The account given by Mrs. Stevenson, the nurse, differed in certain respects, in that she testified that she was called into the room and heard the decedent say "For being so good to me"; that there were some papers lying on top of the bedside table and that the doctor asked her to witness them; that the decedent had a hard time getting comfortable, had trouble with her pen, and that it took her quite a while to do what she was doing; that she thought the blanks were filled in after the decedent and she had signed in that order. She further stated that she remained in the room until the doctor left, and that she didn't know whether she was signing a will, a bond, a contract or a lease and that she guessed she "could sign her life away without knowing it."

Another nurse testified that she had never seen a suitcase in the decedent's room and that the lockbox was kept in a dresser drawer, whereas the doctor stated the stock certificates came from a metal lock-box in a suitcase.

The defendant urges that the case of Brown v. Cobb, 1949, 53 N.M. 169, 204 P.2d 264, establishes three elements to consider in showing the exercise of undue influence and that none of these elements are supported by substantial evidence in this case. First, that the transaction involved acts to the injury of the person swayed by it or to the injury of those persons whom she would have benefited. Second, that the mental weakness of one of the parties is such as to raise a presumption of undue influence or to assist in determining the exercise of undue influence. Third, that

there is lack of proper consideration or adequate motive when the transfer is made.

Although the defendant contends that neither the decedent was injured by the transaction because she is now dead nor those persons she would have benefited since, as the testimony indicated, she loved the doctor as a son and intended to leave all to him, there is ample evidence that the doctor made no disclosure of the transfer to anybody related to or interested in the affairs of the deceased, although inquiry of her financial welfare was made by her nephew and of her financial affairs by her financial advisor. Most serious of all this evidence was perhaps a letter of inquiry written by John H. Sedwick, an Albany, Texas bank executive who administered the deceased's financial affairs for many years. He wrote Dr. Donovan November 17, 1955, less than a month after the transfer, specifically inquiring about the stocks, which letter reads in part:

"Dear Dr. Donovan:

\*   \*   \*   \*   \*   \*

"On November 7th I had a letter from Rev. Ostertag wherein he advised me that he had a visit with you, at the request of Miss Holstein, the purpose of the call being in regard to certain papers. She had requested that these papers, whatever they were, be sent to me and that you advised him (Rev. Ostertag) that you had done this.

This far I have received nothing but your letter. Will you please advise further? Last summer Miss Holstein wrote me that she had certain stocks that she wished me to hold here in safekeeping for her. I have not received them from her and possibly this is what she was referring to. I would like to get the record straight on this at once in as much as the family have asked me about the matter. The A T & T dividend check has been deposited here. Is that the stock Miss Holstein referred to? We shall be glad to take care of the stock or other papers for her here at the bank.

"I await your further reply."

Doctor Donovan never replied to the letter, the contents of which indicate that the doctor had a conversation with the Rev. Ostertag about some papers, although the doctor denied it was concerning the stocks, and further, that the decedent, during a period slightly more than a year before the transfer took place, contemplated some other disposition of the stock.

■ Defendant's next assertion is that the mental weakness of the actor is immaterial as long as he has sufficient mental power to understand the nature of his act, citing Lusk v. Daugherty, 1956, 61 N.M. 196, 202, 297 P.2d 333, but it is of no avail since the issue here is whether all the circumstances, including some evidence of

mental weakness, indicate sufficient opportunity for the exercise of undue influence. See 3 Pomeroy § 955.

Finally, the defendant asserts there was adequate motive and proper consideration for the gift in that it was an expression of the love and appreciation of the donor for all that he had done for her and was given in payment for the many services rendered without making any charge for them in the professed belief that she was a pauper.

However, the court's finding that the decedent owed the doctor nothing at the time of the transfer is supported by evidence in the record, and plaintiff's counsel thoroughly impeached the doctor's statements that he thought the patient a pauper who had paid him very, very little during all the years she stayed in the apartment.

With reference to charges for professional services, medication, meals, intravenous medications and nursing services over the years she remained in the apartment, the doctor stated:

" * * * I don't think she paid a cent, but she might have paid two or three payments during all of those years."

Yet evidence was produced showing she had paid a total of $5,760.06 for the period during which she was in the hospital, at an average of $400 to $500 per month, and a total of $2,845 covering a period from November 1, 1943 to October 5, 1953 which the doctor stated were for "rent, services or something." Another series of checks given at regular intervals for $40 to $45 during the period of August 31, 1945 to June 19, 1954 totalling $4,775 were introduced and the doctor explained these must have been for rent.

Thus there was presented in evidence a total of at least $13,380.06 paid to the doctor by a person he professed to believe was a pauper, notwithstanding the fact she was not on relief but had a regular checking account in Fort Worth of which he was fully aware and also one in Albany, Texas.

Were this a transfer between the decedent and a friend, we might find some merit in the defendant's arguments. 3 Pomeroy 792, § 956; cf. 123 A.L.R. 1505.

However, here we have a transfer of stock certificates from the patient to her doctor of long standing and peculiarly in a position to exert influence over her and dominate her decisions. None of her relatives were near, though many visited her at one time or another. Her financial advisor lived in south Texas. Thus, as the record amply indicates, the decedent had no one to look to for advice other than herself and the doctor and those employed by him, and perhaps the plaintiff, her spiritual advisor at that time.

The transfer itself was a gift, tending to impoverish the donor, to her doctor, al-

legedly "For being so good to me", and not as payment of the patient's hospital bills since she owed nothing at the time of the transfer. There was no showing the decedent had independent advice or was given the opportunity to so have it, nor did the witness know the nature of the documents she was witnessing. There was ample evidence tending to show that the decedent was physically infirm and mentally weak, and that she and the doctor were in very close contact for a period of more than ten years.

To rebut these circumstances the defendant relies on the case of Cole v. Wolfskill, 1920, 49 Cal.App. 52, 192 P. 549, but a reading of that case shows it is readily distinguishable on its facts. There the decedent was quite wealthy and had given a note for $12,500 as payment to the doctor for his services and that of three other physicians in amputating her leg. There was no evidence tending to show any incapacity or weakness of mind or that the decedent was unduly influenced by the doctor or that he had any closer relation to her than his regular visits for which he charged a regular fee which she paid.

■ We believe the circumstances here establish without a doubt a confidential relationship between this patient and her doctor of the highest sort as a matter of fact and of law. Therefore any gift between the two resulting in a benefit to the doctor is subject to close scrutiny and the doctor carries the burden of proving it was made fairly and without undue influence. Ulbrand v. Bennett, 1917, 83 Or. 557, 163 P. 445; Cf. Harrison v. Harrison, 1916, 21 N.M. 372, 155 P. 356, L.R.A.1916E, 854 (guardian and ward); Beals v. Ares, 1919, 25 N.M. 459, 185 P. 780 (husband and wife); Cardenas v. Ortiz, 1924, 29 N.M. 633, 226 P. 418 (confidential relation as a matter of fact).

As we view the evidence, we believe there is an absence of full and satisfactory proof that the gift was made under circumstances fair in all aspects and free of undue influence. Matthaei v. Pownall, supra, and Woodbury v. Woodbury, 1886, 141 Mass. 329, 5 N.E. 275, which is a case similar to the one at bar.

We think the better view under these circumstances would require a showing of independent advice in a gift of this nature to rebut the presumption that it was unfairly induced. See, 123 A.L.R. 1505; Harrison v. Harrison, supra; Beals v. Ares, supra. Particularly is this true where the effect of the gift is to impoverish the donor, 3 Pomeroy 798, § 956b, and there is a confidential relation as a matter of law between patient and physician. 3 Pomeroy 858, § 963; Matthaei v. Pownall, supra; 123 A.L.R. 1505.

■ We hold there is substantial evidence to support the findings of the trial

court, and that the defendant failed to sustain the burden placed upon him by the surrounding circumstances and the patient-physician relationship.

The judgment will be affirmed.

And it is so ordered.

LUJAN, C. J., and SADLER, COMPTON and SHILLINGLAW, JJ., concur.