356 P.2d 455

**Frank L. LINDLEY and Mary E. Holman, Plaintiffs-Appellants,**

**George H. Toliver, Intervenor-Appellant,**

**v.**

**Effie G. LINDLEY, John Krattiger, Harold O. Gore, R. C. Bolton, and First Christian Church, Clovis, a Corporation, Defendants-Appellees.**

**No. 6560.**

Supreme Court of New Mexico.

Sept. 13, 1960.

Rehearing Denied Nov. 15, 1960.

Lynell G. Skarda, Clovis, Grantham, Spann & Sanchez, Albuquerque, for plaintiffs-appellants.

Rodey, Dickason, Sloan, Akin & Robb, John P. Eastham, Albuquerque, for intervenor-appellant.

Smith, Smith & Tharp, Rowley, Davis, Hammond & Murphy, Gore & Nieves, Clovis, for appellees.

D. A. MACPHERSON, Jr., District Judge.

This is a suit to set aside substantial gifts of cash and realty. The lower court sustained the gifts, and we affirm its decision.

The facts before this court are extremely long and complicated, and by reason of the nature of the case, cannot be abbreviated. Trial before the Honorable J. V. Gallegos. District Judge, sitting without a jury, required two weeks. Sixty-two witnesses testified, fifty-three exhibits were introduced, and a transcript of 2,458 pages comprises the record on appeal.

Effie G. Lindley, the donor, is a widow, living at Clovis, New Mexico, and was

seventy-five years of age in September of 1956, the month and year of the deeds of gift under scrutiny, which conveyed the fee title to certain realty, after first reserving unto the donor a life estate therein. The donees consisted of the donor's pastor, one R. C. Bolton; her attorney, one Harold O. Gore; her bookkeeper, one John Krattiger; and the First Christian Church, Clovis. The donor's right to dispose of this very considerable reversionary estate, as well as certain cash gifts to the church, was challenged in this suit brought by the sole surviving brother and sister of the donor's deceased husband, J. E. Lindley, and the donor's only surviving brother, who intervened, making the same challenge. Two of the latter were recipients of a deed to certain land of the donor's in Webster County, Missouri, executed about the same time, which they tendered back to the donor in their pleadings challenging the other gifts. Defendants in the lawsuit are the donor, Effie G. Lindley, and the said recipients of the gifts. The reserved life estate produces the donor a monthly income of between $2,300 and $2,400. Estimate as to the value of the New Mexico realty involved in the gifts ranges from four hundred thousand to six hundred fifty thousand dollars.

The parties will be designated as they were in the court below, except that plaintiffs and intervenor are collectively herein called "plaintiffs," since all take the same position.

While the main issue in the lawsuit was the mental competency of the donor, another issue involved the donor's right to make any gifts at all, requiring a determination of the nature of the title she inherited from her late husband. The donor, Effie G. Lindley, and her husband, J. E. Lindley, on July 15, 1932, executed a joint will, which was probated in Curry County, New Mexico, following the husband's death in 1936. Plaintiffs appear as residuary beneficiaries under this joint will, to take after Mrs. Lindley's death, and they contended in the present suit: first, that Mr. and Mrs. Lindley contracted to be irrevocably bound by the terms of the will; and, second, that the will limited Mrs. Lindley's interest in the inherited property to a life estate, depriving her of the right to make the gifts in question. As plaintiffs aptly point out, should they be sustained on these points, all other issues become moot. Accordingly, we consider these contentions first.

This court has recognized the enforceability of an agreement to make joint wills, but at the same time has pointed out the type of evidence required to prove such an agreement.

In Schauer v. Schauer, 43 N.M. 209, 89 P.2d 521, 523, we stated:

"When mutual wills are executed, pursuant to an oral contract and upon sufficient consideration, and one testator thereafter dies and the other takes under the deceased's will, equity will specifically enforce the contract. * *

"The rule of evidence to establish the existence of such parole agreement is that which applies to other cases * * * the existence of the contract and its terms must be proved by clear, convincing and satisfactory evidence."

See, also, Beveridge v. Bailey, 53 S.D. 382, 220 N.W. 868, 60 A.L.R. 619, in which the court said:

"We cannot establish a contract on a guess. If they wanted to bind each other to their respective wills as written, they should have indicated it in some appropriate manner. * * *"

There was in fact no evidence of a collateral or independent written contract by the Lindleys to be bound by the joint will. Plaintiffs developed that the will was prepared by Fred E. Dennis, an attorney in Clovis, adapting same from a will prepared by a lawyer in California. The evidence further showed that there were two witnesses to the incidents leading up to the execution of the joint will. One was A. W. Skarda, President of The Citizens Bank of Clovis, of which J. E. Lindley was one of the vice-presidents during his lifetime. Mr. Lindley was a close business associate of the witness, and brought three or four other drafts of this will to him for examination. Mr. Lindley referring to the same as an "agreement." Both J. E. Lindley and Effie G. Lindley discussed in his presence what would become of the residue of their property in case of their deaths.

The other witness to these events was Fred E. Dennis. He testified that Mr. Lindley insisted upon a joint will because he was afraid that he and his wife might be killed in a common accident; that he had no knowledge of any negotiations between them, nor of any intention of either that the survivor was contracting to be bound by the will, and that, as a matter of practice, if the will was being drawn as a result of a contract, he would have so indicated in the will. He further testified he had no discussion with Mrs. Lindley prior to the probating of the joint will relative to its effect.

This is the limit of the evidence adduced by plaintiffs and intervenor. We do not believe this constitutes the clear, convincing and satisfactory evidence required, and readily agree with the lower court that no oral agreement, *dehors* the will itself, was established.

We must still answer a contention that the agreement is made out by the will itself. While examining this instrument, we can also address ourselves to their further contention that the joint will vested

Mrs. Lindley with a life estate in the property and no more. With these two matters in mind, we find that on July 15, 1932, J. E. Lindley and Effie G. Lindley duly executed their joint will, pertinent features of which included the following:

"Second: We hereby direct, that in the event of the one or the other of us survive the other, then it is the intent of each of us, that the survivor shall have and receive all of our property and estate, both real, personal or mixed, of every kind and nature and whereever situate, vested or contingent, absolutely free and clear of any conditions or restrictions, with full power of disposition as to any and all of the same, it being the full intention and desire of both of us to convey to the survivor an absolute title in fee simple estate to both the real, personal and mixed estate, the same being subject only to the death of one of us, the survivor shall then become the owner of said estate and the executor of this will and testament, without bond.

"Third: We do further direct that should there by any property or estate belonging to either of us or the survivor thereof, upon the death of the survivor of us, then we direct and give, devise and bequeath said property and estate which has not been otherwise disposed of by the survivor as follows: * *"

After other provisions immaterial to the present discussion, it is provided that the rest, residue and remainder be distributed to intervenor George H. Toliver, ten per cent; to plaintiff Mary E. Holman, ten per cent; to plaintiff Frank L. Lindley, twenty-five per cent; and to the following persons, since deceased, viz.: Laura L. Hickman, ten per cent; Rolla L. Lindley, twenty per cent; and Joe R. Lindley, twenty-five per cent. Toliver is identified as the brother of Effie, the others as sisters and brothers of John E. Lindley.

Joe R. Lindley was appointed executor of the estate of the survivor of both John E. Lindley and Effie G. Lindley.

The will recites in its first paragraph, and the probate proceedings show, the property was all community property.

Surveying only what is contained within the four corners of the will, plaintiffs urge that the use of the plural pronouns "we" and "us," and "both" and the possessive plurals "our" and "their," supply evidence of an underlying contract or obligation; that consideration is supplied in that Effie received twice that which she otherwise would have taken had her husband willed his half of the community property to his brothers, and in that John's brothers and sisters were beneficiaries under the residuary clause; that the will itself consisted of three pages, and that except for about thirteen lines in paragraph "Second," the will is devoted to the disposition of property

"not * * * otherwise disposed of by the survivor," this evidencing a comprehensive plan for disposition of the property in accordance with a contract between them. They argue it is fantastic to believe it could have been executed except as a result of an agreement between the Lindleys.

We do concede that appellants are supported by respectable authority in their argument on the use of the plural pronoun and plural possessives. Beall v. Hardie, 177 Kan. 353, 279 P. 2d 276; Tutunijian v. Vetzigian, Sup., 64 N.Y.S.2d 140, affirmed 274 App.Div. 910, 83 N.Y.S.2d 184, 169 A.L.R. 9. Likewise, on the question of consideration, appellants cite dicta from Schauer v. Schauer, supra, as follows:

> "The fact that the defendant made a will in which her deceased husband's son by a prior marriage was a beneficiary, is some evidence, though not conclusive, that such a contract was made."

They also discuss Shackleford v. Edwards, Mo.1955, 278 S.W.2d 775 with language to the same effect.

As opposed to these features, however, it is evident from the will that paragraph "Second" is strong in its language giving absolute power of disposition to Mrs. Lindley should she survive her husband. The residuary clause makes no provision for the percentages given each of the six beneficiaries should any die (and in fact three have); no provision was made for an alternate executor in event of the death of Joe R. Lindley (an event which has also transpired); there is no attempt to make a joint disposition of property after the death of either, unless there is property left; and the will does not itself recite the existence of an agreement between the parties or the irrevocability thereof.

For reasons of public policy, courts should be cautious to sustain contracts to make mutual wills, because such contracts, in effect, destroy the revocability of wills, and fail to allow for changes in circumstances as years pass.

Here the residuary distribution is made to persons of the same generation and of approximately the same age as the testators, without provision for adjustments as the years passed, should any of the residuary beneficiaries fail to survive. If the Lindleys had intended that the will should stand for all time, it is reasonable to assume they would have made provision for these contingencies which are known in the course of human life to be probable, and some of which have actually occurred in this case.

In weighing the balance between the opposing positions, we support the position of the court below, and find no contract supplied within the four corners of the joint will.

Taking up the further contention of plaintiffs, we face the issue of whether

or not the joint will limits Effie G. Lindley to a life estate, denying her the right to dispose of the property now in question.

Plaintiffs insist that paragraph "Third" restricts the absolute bequest and devise provided in paragraph "Second" and reduced the former to a life estate in Mrs. Lindley upon her husband's death. They further argue that the will established vested interests in the residuary beneficiaries on Mr. Lindley's decease which could not be inpaired, and even go so far as to contend there was no lapse of the shares going to those now deceased, but that the same should be prorated among the residuary beneficiaries still surviving when Mrs. Lindley finally passes on.

Both sides have fully briefed the question. Plaintiffs insist there is ambiguity between the second and third paragraphs, and that in accordance with the law set forth in lengthy annotations at 75 A.L.R. 71, supplemented in 17 A.L.R.2d 7, that either Mrs. Lindley should take only a life estate, or that the remainder over to the surviving residuary beneficiaries should be good on the basis that the executory limitation is valid.

The trial court found that the language of the will was free of ambiguity and that, under the terms thereof, Mrs. Lindley acquired an absolute title in fee simple to the property in question, and that no other persons acquired vested rights therein.

We agree with this fully. Paragraph "Third" upon which the residuary gifts are predicated applies only to property "belonging to either of us or the survivor thereof, upon the death of the survivor of us." We fail to see the many intricacies and involvements claimed by plaintiffs, and thus dispose of this contention.

We might point out that the probate court of Curry County, in administering the estate of Mr. Lindley, made this exact identical adjudication as to Mrs. Lindley's title.

Having thus determined that plaintiffs acquired no vested rights in the residuary estate provided by said joint will, and that Mrs. Lindley acquired absolute title to the property during her lifetime, including the right to dispose of said residuary estate, we now face the major challenge, viz., Mrs. Lindley's mental capacity to make the gifts in question. To review this issue there is no short cut and we must give detailed examination to the facts surrounding each particular gift. Likewise, we must consider various testamentary documents executed by the donor and received in evidence, being six wills executed before September, 1956, and one will and a codicil executed thereafter.

We undertake at this point the difficult task of summarizing many pages of testimony, first taking up the background of the five defendants, then the two plaintiffs,

then the intervenor, the wills and codicil, and finally additional evidence surrounding each gift.

*1. Effie G. Lindley, defendant and donor:*

Defendant Effie G. Lindley married J. E. Lindley when she was 18 years old. She has only one brother, intervenor George H. Toliver, who lived on a farm in Missouri, and had never been in New Mexico; however, when Mrs. Lindley went to Missouri he visited with her. One of his children, Stata Chowning, is remembered in most of Effie G. Lindley's wills. Mrs. Lindley had been afflicted with a serious hearing defect for many years. Mrs. Lindley and her husband lived in California from about 1925 to 1936. After her husband died in 1936, Mrs. Lindley returned to Clovis and there built a new home, the one that she now occupies. Mr. and Mrs. Lindley's joint last will and testament was probated by Fred E. Dennis of Clovis, who represented Mr. Lindley from 1915 up to the date of his death in 1936. Mr. Dennis represented Mrs. Lindley after her husband's demise until around 1944 or 1945. Thereafter the late James A. Hall of Clovis represented Mrs. Lindley until he became ill. Mr. Hall drafted three wills for Mrs. Lindley during this period; one in 1953, one in 1954 and one in 1955. On July 30, 1956, defendant Harold O. Gore, was employed by Mrs. Lindley as her attorney. Prior to that time, as the trial court found, Mr. Gore had done some legal work and received a total of not over $40 in fees from her. In 1938 Mrs. Lindley took some of her business to Durwood O. Jones, then an abstract and insurance man in Clovis, and he kept her books and acted as her business adviser. Mr. Jones moved to Roswell in 1947, and Mrs. Lindley continued to telephone him for advice, and he would frequently come to Clovis. In August, 1956, Mrs. Lindley informed Mr. Jones that she had made different arrangements concerning the caring for her properties. Mr. Jones served throughout these many years without any compensation. The defendant John Krattiger, then went to work for Mrs. Lindley as her bookkeeper and business adviser in July of 1956. Mrs. Lindley paid John Krattiger $100 per month for his services.

*2. Harold O. Gore, defendant, donee, donor's attorney:*

Defendant, Harold O. Gore, is a practicing attorney in Clovis and has been since 1936. He had a speaking acquaintance only with Mrs. Lindley until his employment by her in July of 1956. On July 30, 1956, Effie G. Lindley came to his office for the purpose of changing her will, and Mr. Gore prepared a new will that same day. On August 3, 1956, Mrs. Lindley called him again asking him to come to her house, and requested that he change Mrs. Lindley's will. At this time, she first stated she wanted to give Mr. Gore something, and he refused on the ground he was Mrs. Lind-

ley's attorney. On said day, another will was prepared and executed. On August 20th or 21st, 1956, Mrs. Lindley again contacted Mr. Gore concerning another change in her will. Mr. Gore again went to her house, she again told him that she would like to give him something, but once again he declined. On this occasion, he prepared another will, and it was executed. Mrs. Lindley inadvertently destroyed this will (thinking she was tearing up a prior will) so that on August 27, 1956, Mr. Gore was again called out to her home, asked to redraw one exactly like the preceding one, which he did, and it was executed.

The evidence as to the making of the deeds of gift is furnished largely by the testimony of Mr. Gore. It is admitted that at no time did Mrs. Lindley have the advice of independent counsel. In the first part of September, 1956, the defendant, R. C. Bolton, of the First Christian Church, came to Mr. Gore's office telling him that Mrs. Lindley had remembered the church in her will; that he had checked with Carleton Davis, an attorney in Clovis who had in turn gone to the court house and read the Lindleys' joint will, and that there was some question as to whether or not Mrs. Lindley could execute another will. This apparently caused Mr. Gore also to check the legal consequences of the joint will. He concluded that because of possible litigation arising out of the meaning and effect of the joint will, it would be better for her to make and deliver deeds during her lifetime, reserving to herself all benefits and control so long as she lived. Mr. Gore volunteered this information to Mrs. Lindley. At first, Mrs. Lindley declined to do this, but after Mr. Gore talked to her for about two hours, decided that she would go ahead and do it by way of deeds. Only Mrs. Lindley and Mr. Gore were present at this conversation. The next day, sometime during the second week of September, Mrs. Lindley and Mr. Gore went down to the Clovis National Bank and, in the presence of John Krattiger, a defendant herein and an employee of that institution, made a complete list of her properties and holdings. Mr. Gore checked this information against the tax rolls at the court house. A day or two thereafter, this being September 17, 1956, he again went out to her house, and Mrs. Lindley decided to make deeds and determined which property she would deed to the First Christian Church. Mr. Gore went to his office and a deed to the church was prepared, this being September 17, 1956. This deed was inadvertently dated October 17, 1956. Mr. Gore took the acknowledgment on the deed. The value of the properties covered by this deed was estimated as being about $200,000. After that deed was executed, Mrs. Lindley said that she wanted to give some property to John Krattiger and "Brother Bolton," referring to R. C. Bolton, the minister of the First Christian Church, and to Mr. Gore. Mrs. Lindley told him to return the

next morning with reference to the deeds to Krattiger, Bolton and to him. Mr. Gore returned to Mrs. Lindley's house that evening, and again explained to her that he was in a fiduciary relation and did not want her to give him anything. Mr. Gore again discussed this with her on the morning of September 18, 1956, just before a trip to Albuquerque. He returned at 3:30 p. m. on the next day and found a message from Mrs. Lindley requesting him to go to her house. Mr. Gore put some blank deed forms in his brief case, intending to use Mrs. Lindley's typewriter to draw the deeds if that was the purpose of her call. Mrs. Lindley stated that she had decided to give some property to his little son, Hal. Mr. Gore said that because he was divorced he felt there would be complications, but if she wanted to do it she could go ahead and give it directly to him. At that time, September 19, 1956, she told him she wanted to give him the Snyder Building, her second favorite building, and that she wanted to give the bakery building, which is now the Palace Shoe Building, to John Krattiger. Mr. Gore drew deeds carrying out her desires, right there at Mrs. Lindley's home, and she signed them. Mr. Gore then called Maurine Hill, a secretary in the office of Rowley, Davis and Hammond, attorneys, to come to Mrs. Lindley's house to acknowledge them. Mr. Gore estimated the value of the Snyder Building from $65,000 to $100,000 and the Palace Shoe Building from $45,000 to $50,000. At this time, according to Mr. Gore, she had not decided what property to give to R. C. Bolton. The next morning, September 20, 1956, Mr. Gore returned to the Lindley home where Mrs. Lindley told him she wanted to give "Brother Bolton" certain lots in Artesia and Roswell. Mr. Gore prepared the deed carrying out this desire, Mrs. Lindley executed it, and he acknowledged it. Mr. Gore estimated this latter property as being worth $75,000.

On September 24, 1956, Mr. Gore went to Mrs. Lindley's house to point out the error in the date of the deed to the First Christian Church and to get a correction deed, which Mrs. Lindley thereupon executed. A day or two after this, Mr. Gore went to Mrs. Lindley's house and suggested that she be examined by a psychiatrist because of rumors about town as to her competency. She told him to make the arrangements. Later, two additional psychiatrists were retained. The cost of this medical testimony amounted to some $11,000 at the time of trial. John Krattiger paid these expenses from Mrs. Lindley's funds with her approval. After the deeds had been made and delivered, Mr. Gore gave the joint will of Mr. and Mrs. Lindley further study and suggested to Mrs. Lindley that she execute a new will taking the new events into consideration. This she did by executing the will dated November 27, 1956. By codicil executed February 13, 1957, while Mrs.

Lindley was in the hospital and after this case was filed, John Krattiger replaced as executor one Bertha Evans. After this action was filed on January 3, 1957, Mr. Gore testified that he was retained by Mrs. Lindley to defend the case for her for a fee of $5,000. Of this amount Mr. Gore had received $2,750 at the time of trial.

*3. R. C. Bolton and First Christian Church, Clovis, defendants, donees, donor's minister and latter's church.*

R. C. Bolton came to Clovis in October of 1952 from Amarillo, as minister of the Central Church of Christ. Thereafter, a division occurred in this church as the result of the church's receiving about $130,-000 under the will of one Mrs. Lizzie Boykin and subsequent confusion over the building of a new church. As a result, R. C. Bolton resigned from the Central Church of Christ in August, 1954. Two months later, First Christian Church, Clovis, a corporation, was organized, and Mr. Bolton became its pastor. The defendant Gore did the legal work on the incorporation. Mr. Bolton called Mrs. Lindley two or three months after he arrived in Clovis and informed her that he was preaching at the Central Church of Christ and was a Christian minister. She told him that if he was a Central Church of Christ minister she did not want to talk to him, but she would if he was Christian minister. He went to her home immediately. Mrs. Lindley was not a member of the First Christian Church, Clovis, the defendant herein, and neither was she a member of the Central Church of Christ Church in Clovis. Rev. Bolton understood Mrs. Lindley to be a member of a First Christian Church in Missouri where she had been baptized. Up until the formation of the First Christian Church, R. C. Bolton called upon Mrs. Lindley at her home once every two to three months. Mrs. Lindley's first gift was made to the First Christian Church on September 24, 1954, in the amount of $1,000. The next gift was one of $100 supposedly made about Christmas of 1954. On March 2, 1955, Mrs. Lindley gave the First Christian Church $5,000 in cash to help pay on the lots that Mr. Bolton had informed her the church was purchasing for the new building site. On June 25, 1956, Mrs. Lindley made another cash gift of $500 to the First Christian Church. The next gift to the First Christian Church was one of $25,000 made on October 30, 1956. R. C. Bolton's first conversation with Mrs. Lindley indicated that she had a strong feeling about the name First Christian Church. In fact, she had previously, in one of her wills, favored a First Christian Church at Portales, New Mexico. Rev. Bolton testified that although he did not solicit Mrs. Lindley for money, he did let her know that God's work required financial support. The Rev. Bolton suggested that the new church be named First Christian Church, but denied that Mrs. Lindley's affinity for that

name had anything to do with his suggestion.

*4. John Krattiger, defendant, donee, donor's bookkeeper.*

John Krattiger came to Clovis in 1945 where his father operated a bakery in a building owned by Mrs. Lindley on Main Street, now known as the Palace Shoe Store, being the same building given to Krattiger. Mr. Krattiger started working at the Clovis National Bank in November, 1947, prior thereto having worked as a bookkeeper in his father's bakery. He always had Mrs. Lindley's bakery rent check ready when she asked for it. Since 1948, he has been a teller at the Clovis National Bank, and usually waited on Mrs. Lindley in her banking transactions. Other than that, Krattiger had no dealings with Mrs. Lindley up until 1956 and did not even know her late husband. In July, 1956, Mrs. Lindley sent word to Mr. Krattiger that she wanted him to do her bookkeeping, and he apparently agreed to this. In August, 1956, Durwood O. Jones brought an unexecuted lease to Mrs. Lindley, had her sign it, got her books, totaled them up and turned them over to Krattiger. Mr. Krattiger states that he delivered the books to a certified public accountant of Clovis to set up a simplified bookkeeping system and for audit. Mr. Krattiger thereafter assisted Mrs. Lindley in making her deposits, typed bills for her, and was paid $100 a month remuneration commencing in September. He also negotiated two leases for her prior to getting the books back from the accountant. He was taking care of her affairs at the time of trial. On Sunday night, September 23, 1956, at Mr. Gore's request, Mr. Krattiger went to Mr. Gore's office, at which time he was given the deed of gift in question (dated September 19, 1956) and an agency contract (dated September 20, 1956). Mrs. Lindley's explanation for making this gift was that Krattiger's father had been her tenant, that Krattiger had always had her rent checks ready for her when he worked at his father's bakery, and had waited on her at the bank. The agency contract appointed Mr. Krattiger as an agent to collect and receive all rents and deposit same, to pay all of Mrs. Lindley's personal accounts and taxes by drawing checks on her account, to prepare tax returns, to negotiate and execute leases, and to have the accountant audit the accounts at the close of each year and deliver a copy thereof to her attorney, Harold O. Gore. At this time, there was about $35,000 in her checking account at the Clovis National Bank. Later, on October 2, 1956, in a letter addressed to the Clovis National Bank and the accountant, acknowledged before Harold O. Gore, Mrs. Lindley authorized Krattiger as her agent to draw from her presonal account on his signature cash sums each month not to exceed $150 to be given to her for household groceries and incidentals, and giving him

free access to her safety deposit box in the bank. While Mrs. Lindley was in the hospital on February 13, 1957, after this suit was filed, she executed a codicil to her will in which John Krattiger became her Executor.

### 5. Frank L. Lindley, plaintiff.

Frank L. Lindley, 69 years of age and a resident of Nevada, Missouri, is the only surviving brother of J. E. Lindley, deceased husband of Effie. He had not had any communication with Effie G. Lindley for 10 or 15 years, either by telephone or by mail. His relations with his brother, J. E. Lindley, were always affectionate during the latter's lifetime. Mr. Gore mailed him a deed executed by Mrs. Lindley on September 29, 1956, conveying land she owned in Webster County, Missouri, giving intervenor George Toliver a life estate therein, with remainder over to this plaintiff. Mr. Gore explained this was a gift from Mrs. Lindley and suggested the deed be recorded, which he thereupon did. To properly prepare this deed, Mr. Gore had visited Missouri, checked the description, and employed Missouri counsel to draw the deed.

Thereafter, this plaintiff received an anonymous letter mailed in New Mexico, saying that Mrs. Effie G. Lindley was in bad shape and needed good substantial food and somebody to look after her, and that he should come down to see her. The plaintiff, his wife and youngest boy left for Clovis

the next day, staying at a motel there. They called on Mrs. Lindley at her home and she did not recognize them. Later, however, she said that plaintiff was "one of the boys," but never mentioned the Lindley name. Plaintiff testified that when he determined Mrs. Lindley was giving away money and property to churches and people that her husband, J. E. Lindley, had never heard of, he decided it was time to file suit.

### 6. Mary E. Holman, plaintiff.

Mary E. Holman, 76 years of age and residing at Arcola, Missouri, is the only surviving sister of J. E. Lindley. She had known Mrs. Lindley since the latter was 12 years of age. In fact, Mrs. Holman's husband taught Mrs. Lindley in the public schools. This plaintiff did not have any correspondence with Mrs. Lindley after her husband passed away. In October, 1956, Mary E. Holman and her husband likewise came to Clovis to visit Mrs. Lindley because of the same anonymous letter that her brother, Frank L. Lindley, had received. She called on Mrs. Lindley, at which time Mr. Gore was also present. Mrs. Lindley failed to recognize her at first, but did later on.

### 7. George H. Toliver, intervenor.

George H. Toliver, the intervenor, is the brother of Effie G. Lindley. He was not physically able to be at the trial. He is now 77 years old. Effie G. Lindley had no other

brothers or sisters. Toliver had two children, Herbert Toliver and Stata Chowning. Toliver was convicted of a felony some 35 years ago, a fact known to Mrs. Lindley to her displeasure. Toliver and Frank Lindley tendered back to Mrs. Lindley the deed to the Missouri land when they started proceedings against her in the present lawsuit.

8. *Testamentary documents of Effie G. Lindley, defendant and donor.*

The court had before it as exhibits seven wills executed between 1953 and 1957 by Effie G. Lindley. In appellants' brief, a chart containing 24 subtitles, compares the seven wills. All wills provide for burial at Greenfield, Missouri. Certain Missouri land, by the first six wills, goes to George Toliver for life, thereafter by the first will goes to his heirs, and by the other five wills to Frank Lindley. Eliminating this devise, a brief summary of the wills for present purposes is as follows:

(1) The earliest will, dated May 19, 1953, remembers Durwood O. Jones, Stata Chowning, the City of Clovis (for an auditorium), and the First Christian Church, Clovis (if there be one, if not then to the City of Clovis for an auditorium),

(2) The next will, executed in December, 1954, differs somewhat, but names the same beneficiaries, except that the church is changed to the First Christian Church of Portales.

(3) The third will, dated January 18, 1956, while again differing in some provisions, includes the same beneficiaries, except that the church now becomes the First Christian Church of Clovis.

(4) The fourth will, dated July 30, 1956, eliminates Stata Chowning except for a diamond ring, and provides more liberally for the "First Christian Church of Clovis of which R. C. Bolton is now pastor." Durwood O. Jones is still remembered, and is still one of the co-executors, as he had been in the prior three wills. (In the four preceding wills Durwood O. Jones is given realty of considerable value).

(5) By the fifth will, dated August 3, 1956, Jones received $5,000 and nothing else, and is replaced as executor by one Beulah Hart Miller, an old friend. Stata Chowning receives the diamond ring and Beulah Hart Miller the Cab Building at Clovis. Everything else goes to First Christian Church of Clovis of which R. C. Bolton is now pastor.

(6) The sixth will was executed August 21, 1956, and inadvertently destroyed. (It was duplicated by a will, executed August 27, 1956, identical except for the attesting witnesses, and for the present purposes still considered the sixth will). One Bertha Evans, another old friend, replaces Beulah Hart Miller both as executor and as devisee of the Cab Building. Stata again receives the diamond ring. Otherwise, everything

again goes to "First Christian Church of Clovis of which R. C. Bolton is now pastor."

(7) The seventh will, dated November 22, 1956, again names Bertha Evans as executor, leaves her the Cab Building in Clovis, and 10% of the lapsed residue of the joint will of July 15, 1932. Stata again receives the diamond ring. The balance of the residue goes to First Christian Church of which R. C. Bolton is now pastor. (At this date, deeds had been executed covering the Missouri and other properties, so that no provision covering the same is made).

The last three wills provide that Harold O. Gore serve as attorney for probate of the estate.

A codicil was executed February 13, 1957, making John Krattiger executor in lieu of Bertha Evans. The last four wills and codicil were prepared by Harold O. Gore.

### 9. Additional evidence concerning gifts.

■ Under the substantial evidence rule, the court on review will consider the features of the transcript most favorable to the party prevailing below and for present purposes will assume that the trial court relied on evidence supporting the voluntary character of the deeds under scrutiny.

To that end, the testimony of Rev. Bolton, fairly interpreted, would support a finding of an absence of undue influence, insofar as either he or his church was concerned. Specifically concerning the gift to the church, no member thereof solicited the gift, and none knew of the donor's intention in that regard until the deed of gift was delivered to the trustees of the church. Testimony showed the name of the church was changed before Rev. Bolton became pastor thereof.

Defendant Krattiger was advised by Mr. Gore that his name was mentioned by Mrs. Lindley concerning a gift, but Krattiger himself never solicited a gift, and knew nothing about the completed transaction until the deed was delivered to him at Mr. Gore's office.

Concerning the gift to Mr. Gore, we as an appellate court, question his reasoning in declining the gift on several occasions because of his relationship, and then relenting only because his donor insisted. Nevertheless, the court below had substantial evidence to support the gift. Mrs. Hill, the notary, who acknowledged the deeds to Gore and Krattiger, testified she had known Mrs. Lindley for many years, that she recognized the importance of the deeds, satisfied herself Mrs. Lindley knew what she was doing, and even had her raise her hand in acknowledging the deeds to be her free act.

Subsequent to the making of the gifts under scrutiny, Mrs. Lindley told witnesses she was pleased with what she had done. Substantial evidence of confirmation or ratification is in the record.

With these rather complicated facts for our background, this court is now called

upon to further review the decision of the court below in holding: (a) That Mrs. Lindley was mentally competent to execute and deliver the deeds in question; (b) that John Krattiger and First Christian Church, Clovis, did not stand in a confidential or fiduciary relationship to Effie G. Lindley; and (c) that donees Gore and Bolton, standing in such relationship, successfully overcame the presumption of undue influence and fraud admittedly present in confidential relationships.

As to Mrs. Lindley's mental competency and capacity, we sustain the court below on the basis of the substantial evidence rule, exemplified by these citations from two of our prior decisions:

"In Marchbanks v. McCullough, supra, we define substantial evidence in the following language: 'If reasonable men all agree, or if they may fairly differ, as to whether the evidence establishes such facts, then it is substantial.'

"Substantial evidence may also be defined as evidence of substance which establishes facts and from which reasonable inferences may be drawn. * * *

" * * * Consequently, we cannot say that the evidence is not substantial. We are impressed, however, from a search of the entire record that there is evidence from which the trial court could have reached a different conclusion. Nevertheless, the function of determining the facts is a duty resting solely within the province of the trial court." Brown v. Cobb, 53 N.M. 169, at pages 172, 175, 204 P.2d 264, at page 266.

"This court, has so repeatedly held that the evidence must be considered in an aspect most favorable to the appellees and that the facts found by the lower court are the facts to be reviewed by us and if supported by substantial evidence they must be sustained, that a citation of authorities is unnecessary." Pentecost v. Hudson, 57 N.M. 7, at page 11, 252 P.2d 511 at page 513.

While we believe that the court equally well could have arrived at the opposite conclusion on the matter of the donor's competency, nevertheless this court will not pass on the weight of the evidence. Two psychiatrists testified that the donor was incompetent; three psychiatrists testified that she was competent; innumerable lay witnesses testified on each side; almost all agree that the donor was in frail health and hard of hearing and had a speech defect (identified medically as nominal aphasia), which the defendants' expert witnesses testified probably accounted for her apparent confusion at times. To further outline the evidence supporting a finding of competency is unnecessary. Suffice it to say that we are convinced that there is

substantial evidence to support the finding of competency at the time of the gifts under scrutiny—certainly that reasonable men would fairly differ as. to whether the evidence established such fact—which makes it substantial under our guiding principles above set forth.

We now pass to the knotty problem of gifts between persons standing in confidential relationships. By pretrial order entered without objection in this case, the court below ruled that Harold O. Gore, Mrs. Lindley's attorney, and R. C. Bolton, her minister, both stood in confidential relationship to her; that the burden of proof at the trial was upon them to overcome the presumed presence of undue influence; and that they would first offer their proof thereon. The trial was so conducted. The court reserved ruling on the status of the church and Mr. Krattiger.

The basic principle in transactions of this type was well expressed by Justice Bratton years ago in Cardenas v. Ortiz, 29 N.M. 633, 642, 226 P. 418, 422:

"* * * When such relation of trust and confidence is established, and while it exists a business transaction takes place between the parties inuring to the benefit of the person in whom such trust or confidence is reposed, it is presumptively the result of undue influence, and hence fraudulent, and the burden immediately shifts to

him to show that the parties were dealing at arm's length, or that the transaction was fair and had in the most perfect good faith and was free from fraud."

Very helpful annotations assist us on the subject of nontestamentary gifts to an attorney from his client (24 A.L.R.2d 1288) and on the subject of similar gifts to a pastor from his parishioner (14 A.L.R.2d 649). These exhaustive discourses point out that the cardinal principle is fairness and honesty in each transaction, with many factors to be considered, among them being mental or physical infirmities, old age, lack of independent or disinterested advice, active solicitations and persuasions, predisposition to make gifts, improvidence or failure to provide for own family, delay in revealing gift, ratification, confirmation, etc. We also have precedents from this court to assist us.

In Cardenas v. Ortiz, 1924, 29 N.M. 633, 226 P. 418, supra, this court affirmed the lower court's cancellation of a deed to a 35-year-old nephew from his uncle and aunt who were aged, infirm, weak physically and mentally, and unable to read or write. Justice Bratton sums up the case at pages 639–640 of the state report, 226 P. at page 421:

"* * * The very facts here disclosed, that is, parting with house and home without consideration by one

who is cursed with poverty, almost 70 years old, infirm, mentally weak and feeble, may well support the conclusion that she was compelled so to do by undue influence of some character."

Likewise in Brown v. Cobb, 1949, 53 N.M. 169, 204 P.2d 264, this court affirmed the trial court in cancelling a lease, from an employer to her employee, the former being enfeebled and disabled physically and mentally by disease. Quotations from this case appear supra in connection with the substantial evidence rule.

More recently, in Ostertag v. Donovan, 1958, 65 N.M. 6, 331 P.2d 355, 359, 70 A. L.R.2d 583, a doctor received a gift of stock valued at $6,000 from an 83-year-old patient who had been in his hospital at Raton. In affirming the lower court's decision rescinding the gift on the ground of undue influence, Justice McGhee, in speaking for this court, said:

"We believe the circumstances here establish without a doubt a confidential relationship between this patient and her doctor of the highest sort as a matter of fact and of law. Therefore any gift between the two resulting in a benefit to the doctor is subject to close scrutiny and the doctor carries the burden of proving it was made fairly and without undue influence. * * *

"As we view the evidence, we believe there is an absence of full and satisfactory proof that the gift was made under circumstances fair in all respects and free of undue influence. * * *

"We hold there is substantial evidence to support the findings of the trial court, and that the defendant failed to sustain the burden placed upon him by the surrounding circumstances and the patient-physician relationship."

While in the case at bar our result is the opposite of these three cases, nevertheless we can best state our position by reiterating Justice Compton's observations from Brown v. Cobb, supra, [53 N.M. 169, 204 P.2d 268] viz.:

"We are impressed * * * from a search of the entire record that there is evidence from which the trial court could have reached a different conclusion. Nevertheless, the function of determining the facts is a duty resting solely within the province of the trial court."

We have already affirmed the donor's mental competency; the foregoing recitation of facts shows ample evidence to justify the trial court in finding no active solicitations or persuasions in connection with these gifts; certainly the testamentary documents show a predisposition to remember certain of the donees, and to eliminate

458

the plaintiffs; the gifts do not impoverish the donor; she has ample income for her lifetime; on several occasions she ratified and confirmed the gifts and expressed her satisfaction with what she had done.

The question of lack of independent advice requires further discussion. It is admitted here that the donor did not receive the benefit of independent or disinterested advice before making the gifts in question. This problem was mentioned by Justice McGhee in Ostertag v. Donovan, supra, as follows:

"We think the better view under these circumstances would require a showing of independent advice in a gift of this nature to rebut the presumption that it was unfairly induced. See, 123 A.L.R. 1505; Harrison v. Harrison, supra, (21 N.M. 372, 155 P. 356); Beals v. Ares, supra, (25 N.M. 459, 185 P. 780)."

In addition to the annotation cited by Justice McGhee, the specific problem of independent advice is discussed in the annotations already cited, viz., 14 A.L.R.2d 649, 666, and 24 A.L.R.2d 1288, 1298. To quote from one of them:

"A failure to show that such advice was made available will weigh heavily on the side of the presumption of undue influence, and it will take clear and satisfactory evidence that such influence was not exerted for the

court to hold that the burden of proof has been met by the donee." 14 A.L.R. 2d 649, 666.

■ We do not believe that every nontestamentary gift between persons in confidential relationship must automatically fail because of lack of independent advice. We do agree with Mr. Justice McGhee that such is a salutary procedure. However, we hold that the lack of such advice simply adds to the onus or burden placed on the donee to prove that a particular gift was made under completely honest and fair circumstances, and that undue influence and duress was in fact absent. We presume that the trial court considered this in arriving at its decision. We agree that the record here does contain substantial evidence to support the finding that there was in fact no undue influence in connection with these gifts, even conceding the lack of independent advice and realizing then that the record must show a higher and stronger type of evidence.

■ As to the issue of whether John Krattiger and First Christian Church, Clovis, stood in a fiduciary capacity to the donor, the court below held they did not, and there is again substantial evidence in the record to support this finding. Beyond this, however, is the fact that if there is substantial evidence to find no undue influence practiced by Rev. R. C. Bolton or by Harold O. Gore, then the record sup-

ports the same finding as to the defendants Krattiger and First Christian Church.

Having thus disposed of plaintiffs' contentions, we should clarify a few remaining points. The donor's cash gifts of $31,600 to defendant First Christian Church, found valid by the court below, are affirmed by us under the terms of this decision. The deed of the Webster County, Missouri, land to George Toliver for his lifetime, with remainder over to Frank L. Lindley, found valid by the court below, is likewise confirmed by us. As to any property undisposed of by the donor, the court below held in effect that upon her death and in the absence of disposition thereof by deed or subsequent will, the same would go under the terms of paragraph three of said joint will of July 15, 1932, and become the property of the persons therein named in the proportions set out if they survived her (thus referring to the two plaintiffs and intervenor herein); and that the bequests to James L. Lindley, Laura L. Hickman, Rolla L. Lindley and Joe R. Lindley, now deceased, have lapsed. This we also confirm, but take caution to point out that the court below, as well as this court on appeal, is passing judgment on Mrs. Lindley's right and competency to make the gifts in question, and is not adjudicating her testamentary capacity to make the various wills and codicil described above. In the absence of a contract, a will remains an ambulatory document. Here

Mrs. Lindley is still alive, and adjudication as to the validity of these testamentary documents would be premature.

Finding no error in the record on appeal, the judgment of the court below is affirmed. It Is So Ordered.

COMPTON, C. J., and CARMODY and CHAVEZ, JJ., concur.

MOISE, J., not participating.